**MAJOR COAT COMPANY, INC.**

v.

**The UNITED STATES.**

**No. 31–72.**

United States Court of Claims.

Oct. 20, 1976.

Theodore M. Kostos, Philadelphia, Pa., atty. of record, for plaintiff. Stassen Kostos & Mason, Philadelphia, Pa., of counsel.

Raymond B. Benzinger, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant.

Before LARAMORE, Senior Judge, and DAVIS and BENNETT, Judges.

OPINION

BENNETT, Judge.

■ This renegotiation case comes before the court on plaintiff's and defendant's exceptions to findings of fact * and the opinion issued on July 25, 1975, by Trial Judge George Willi, in accordance with Rule 134(h), in which he held that plaintiff realized excessive profits of $711,231. Plaintiff, Major Coat Company, Inc.,[1] brought this action seeking a redetermination of a unilateral order of the Renegotiation Board (the board) that it realized $740,760 in excessive profits, before federal income taxes, out of total net profits of $1,079,962 for its fiscal year ended January 31, 1968 (FY 1968). Plaintiff now prays for a judgment that it earned no excessive profits within the meaning of section 103(e) of the Renegotiation Act of 1951 (the Act),

* Whereas the court adopts the trial judge's findings of fact as set forth in his recommended decision they are not printed herein since such facts as are necessary to the decision are printed in this opinion.

1. Renegotiated together with its sister holding company, Major Clothing Co., as a "consolidated group." · See 50 U.S.C. App. § 1215(a) (1970).

50 U.S.C. App. § 1213(e) (1970), while defendant presses for a ruling that the extent of the excess was even greater than that found by the board, or about $900,000. Upon careful review of the record we are unable to agree with either the board or the trial judge, and find that plaintiff received excessive profits of $560,000. The facts and reasons leading to this conclusion are fully set out hereafter. The suit is brought under section 108 of the Act, as amended, 50 U.S.C.A. App. § 1218 (Supp. V, 1975), which provides that judicial review of the board order shall occur in a de novo proceeding. This provision is understood to require not only a full, due process trial to develop the facts in the case entirely independent of what the board may have done, but also that defendant, in seeking the return of monies paid out by it, bear the burden of persuading the court by a preponderance of the evidence that the renegotiated contractor realized excessive profits and that the extent of that excess was as defendant claims. *Lykes Bros. S.S. Co. v. United States,* 459 F.2d 1393, 1401–403, 198 Ct.Cl. 312, 327, 330 (1972) (hereafter *Lykes Bros.*).

Congress set forth in the Renegotiation Act the means of determining the existence and extent of excessive profits in a series of guidelines known as the "statutory factors." Section 103(e). These describe the essentially comparative process by which a reasonable level of profit is determined. The factors requiring consideration of the character of the renegotiated contractor's business, the net worth and capital employed, and the reasonableness of his costs and profits outline the information that must be assembled in order to construct a reasonably accurate comparison of the contractor's performance in the fiscal year under renegotiation (the review year) with the performance of similar firms. This group of factors provides the means of identifying the firms (including plaintiff itself in the past years) sufficiently similar to plaintiff that they may be considered part of plaintiff's "industry," and of determining the pricing policy and profit picture of that industry (or industries). Three other statutory factors focus attention on the contractor's efficiency, the business risks he assumed, and his contribution to the defense effort, to ascertain how well the renegotiated contractor fared against other firms in his industry on points affecting profitability in a competitive market. This analysis answers "[a] most important question in renegotiation," which is " '* * * where the contractor in a defense industry belongs in the hierarchy of profit returns of industry as a whole and the reason for his being placed in that particular position.' " *Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 340, 208 Ct.Cl. 704, 730 (1976).

■ (1) *Character of Business.* Section 103(e)(5) of the Act provides that a determination of excessive profits must take into consideration the "[c]haracter of [the renegotiated contractor's] business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover." This factor requires the assembly of basic information about the renegotiated contractor's total operation during the review year, laying the foundation for a later, meaningful comparison of the contractor's review year business and performance with that of firms functioning in a competitive market. The factor focuses attention, *inter alia,* on the kind of renegotiable product made, the nature of the manufacturing operation and the difficulties inherent in the product's manufacture, the sources of the materials from which it was produced, the kind of product that the renegotiated contractor marketed commercially (if any) during the review year or in preceding years, the difficulty of making that product relative to the renegotiable item, and the state of the commercial market in which the contractor had operated or was operating. Most of our commentary under this factor relies heavily on the opinion of the trial judge.

Plaintiff is a small, family-owned enterprise that began operation in 1945 as a custom manufacturer of men's clothing, primarily coats, jackets, and trousers, which it produced from fabrics supplied by commercial customers in what was known as a "cut,

make, and trim" operation. Nourished by the personal energy and initiative of its owners, three brothers, the venture grew and generally prospered until, by 1960, the business was conducted in newly constructed and enlarged facilities located just outside Bridgeton, New Jersey. By then the brothers had established profitable working relationships with McGregor-Doniger Co. (McGregor) and Londontown, Inc., marketer of London Fog raincoats. While the requirements of these two customers were seasonal in nature, they dovetailed to provide plaintiff with full utilization of its productive facilities on nearly a year-round basis. With this substantial and sustained patronage, plaintiff's business continued to grow. Earnings were modest, in keeping with the very limited capital available to the brothers, yet progress was sufficient to qualify plaintiff for a $100,000 loan from the Small Business Administration and to enable it punctually to curtail and ultimately to liquidate that obligation in 1966.

Beginning in 1964, the clothing industry experienced a general upturn in sales and earnings that continued substantially unabated until the last quarter of 1969. Plaintiff's revenues from McGregor and Londontown increased accordingly, and in its fiscal year ended January 31, 1966, it showed a combined[2] net profit of $26,000, a 2.9-percent return on receipts of approximately $900,000. Prospects for plaintiff's future with McGregor and Londontown were predictably good. This was generally the climate in which plaintiff found itself on the eve of its first major involvement with the Government as a contract supplier of military clothing.

In May 1966 the Army was in urgent need of 400,000 cotton sateen trench coats known as the OG–107. Because the clothing industry generally was operating at peak production at the time, military buyers found that they were unable to attract qualified suppliers as interested bidders for this item. It was therefore decided that this essential procurement should be effected by the issuance of a so-called "rated order." That emergency device, authorized by a provision of the Defense Production Act of 1950, 50 U.S.C. App. § 2071 (1970), and regulations issued thereunder, legally obligated an operator in plaintiff's circumstances to accept a contract to produce an article such as the OG–107 and to do so without regard to the prejudicial effect on its existing relations with commercial customers. Such an order was issued to plaintiff on May 16, 1966, for 52,200 OG–107 coats. Plaintiff resisted the order because filling it meant the complete sacrifice of sales to its valued customer, McGregor, but when it was given to understand by the procurement authorities that it could be legally compelled to fill the order if it did not agree to negotiate contract terms voluntarily, it reluctantly entered into such negotiations. It incurred the serious disapproval of McGregor when it advised that it could not service the account until it had filled the Government's order. This occurred at a time when McGregor had substantial outstanding sales commitments that it had assumed in reliance on the future production that it anticipated from plaintiff. McGregor ultimately had no choice but to accept this development and adjust to it as best it could. In doing so, however, it informed plaintiff that the incident would be remembered when commercial conditions changed from a seller's to a buyer's market. McGregor ultimately made good on that pledge—to plaintiff's considerable detriment.

Plaintiff satisfactorily and punctually completed its rated order work on the OG–107 in the fall of 1966. Although its overall capacity was such that it did not have to turn away the Londontown account while it was performing the OG–107 work its commercial business (i. e., nondefense or nonrenegotiable business) in its fiscal year ended January 31, 1967 (FY 1967), resulted in a loss of $60,961.14. The trial judge found that this loss was attributable to the disruption and dislocation caused by the enforced intervention of production of the OG–107.

**2.** Together with Major Clothing Co.

On October 7, 1966, just as plaintiff had finished its OG–107 work, it was issued another rated order by the Army, this time for a first procurement of a dress overcoat. This new item, a top-quality, wool-gabardine coat, extremely complex and demanding in construction, was designated the AG–44, and it was plaintiff's work on it that was the source of the renegotiable revenues that are the subject of this proceeding.

Because of the novelty and complexity presented by the AG–44, the activities and negotiations that occurred between issuance of the rated order and consummation of a formal contract included a plant survey by a representative of the Defense Personnel Support Center. The representative concluded that plaintiff could meet the Government's needs provided that: (1) it promptly terminate the remainder of its civilian business, i. e., the Londontown account, (2) it take on an additional quantity of personnel skilled in various particular garment-making functions, and (3) it purchase a specified assortment of special-purpose sewing equipment. Meanwhile, plaintiff decided to accept an order for the AG–44. Though it realized that such acceptance would require the interruption, if not the permanent loss, of its valued relationship with Londontown, it concluded that since it could not then reinstate the McGregor business and could presumably be compelled in any event to accept some AG–44 business, and because its experience in manufacturing the OG–107 had been profitable and otherwise satisfactory, it might as well appropriate its entire resources and efforts to the performance of Government work.

Plaintiff took the steps specified by the defense agency representative, engendering essentially the same hostile reaction in Londontown that it earlier had in McGregor, incurring substantial personnel recruitment and training costs, and expending some $28,000 for specialized equipment, almost all of which was useful only for making the AG–44. On November 3, 1966, plaintiff was awarded a fixed-price contract for 45,000 AG–44 coats, subject to a Government option to purchase an additional 50 percent at a somewhat reduced figure.

While production on the AG–44 was fully under way, in September of 1967, New Jersey state authorities threatened to curtail plaintiff's operations unless it agreed to take prompt action to provide substantial additional sanitary facilities to accommodate its expanded work force, which rose from 230 workers on the OG–107 contract to 350 workers on the AG–44. In order not to interfere with AG–44 production, plaintiff complied and undertook the construction of a new building on its premises. The building, completed in early 1968, cost $107,000, and has at all times since been largely extraneous to plaintiff's needs. During FY 1968, plaintiff commenced and completed all of its AG–44 work, delivering 68,109 coats under its prime contracts—the approximate volume of the original contract plus the 50-percent option quantity—and 10,010 coats under a subcontract that it obtained later in the year from L. W. Foster Sportswear Co., Inc. Plaintiff, however; subcontracted none of its AG–44 work.

Dr. William F. E. Long, called by defendant as its expert witness on economic matters, testified that plaintiff should be accorded no consideration for the "complexity of [its] manufacturing technique," in the statutory factor's words, because in his opinion plaintiff's manufacturing operation was not complex. It was Dr. Long's view that a manufacturing process is complex to the degree that the end-product yield from a given quantity of raw material cannot accurately be forecast. He expressly rejected the notion that the statutory phrase "complexity of manufacturing technique" relates in any way to the intrinsic complexity of the end item involved. The evidence shows, as the trial judge found, that the AG–44 coat was very complex in construction and design and that its production consequently required a commensurate degree of skill and painstaking care. The coat was acknowledged by qualified and experienced Government procurement officials, appearing as witnesses, to be among the most

complicated garments ever procured by the military. The trial judge correctly decided to accord plaintiff consideration for the complexities involved in the coat's manufacture, even though the coat's production showed no erraticism in yield. Defendant's expert witness, as the trial judge noted, simply misapprehended the meaning of the statutory phrase, which is far less restrictive that he thought. The board's regulation commenting on the character-of-business factor notes in pertinent part: "The manufacturing contribution will vary with the nature of the product and the degree of skill and precision required in the work performed by the contractor." 32 C.F.R. § 1460.14(b)(1) (1968). Intrinsic complexity of the end item and the degree of skill and care needed to produce it are the subjects to be considered under the subfactor of manufacturing complexity.

■ Having resolved to reject Dr. Long's reading of the subfactor and to credit plaintiff with "favorable consideration on complexity grounds," the trial judge went on to decline assigning a dollar value to that "favorable consideration," noting that the record offered no guidance as to what that value should be. He concluded that recognition of the complexity of manufacturing technique in plaintiff's operation could only serve to reinforce other determinations favorable to plaintiff made in his opinion. Plaintiff has objected to this approach, arguing that the purpose of the statute in according favorable consideration where this is merited was frustrated by what the trial judge did. We think that the trial judge is more nearly correct here than is plaintiff, for consideration of production complexity is in reality the assessment and comparison of "[t]he relative complexity of the manufacturing technique," as the board states in the regulation just cited. The term "relative" is the key: a comparison of degrees of manufacturing complexity is anticipated, between plaintiff and those firms against whose profit levels plaintiff's will be measured, to ascertain that plaintiff's performance will not be compared with that of a firm not encumbered by similar complications, or at least that plaintiff will not be

so compared without making appropriate adjustments. The assessment of the degree of production complexity is not of itself a vehicle for granting rewards or withholding them, but simply lays the foundation for a later comparison. There can be no meaning to a finding that one firm is possessed of production line complexities, or that another has none, for there are no absolutes here; the only meaning is that which surfaces in the final comparison of the assessed degrees of complexity among the firms in plaintiff's "industry." Accordingly, the trial judge properly resisted the invitation to translate any finding on the complexity of plaintiff's manufacturing technique into a monetary credit for plaintiff. His findings that the process of manufacturing the AG–44 coat was complicated and required a high degree of skill and care to accomplish with success, and that the coat itself was one of the most complex garments ever procured for military use, must be considered in comparing plaintiff's work and profits with the work and profits of other firms, in the discussion on the "reasonableness of costs and profits," *infra.*

Plaintiff's renegotiable contracts obligated it to construct the AG–44 coats out of fabrics furnished by the Government (so-called Government-furnished property, or GFP) under a standard Government contract clause, entitled GFP Bailment System. A board regulation advises:

> (2) A contractor who uses customer-furnished materials generally is not entitled to as large a dollar profit as the dollar profit to which such contractor would have been entitled had it furnished the materials itself. In the latter case, the contractor would have expended effort in finding or acquiring the materials, would have invested capital in the materials and would have assumed the risks of obsolescence, spoilage, or other loss inherent in owning such materials. * * *.
> [32 C.F.R. § 1460.14(b)(2) (1968).]

Defendant contends that the value of the GFP, an administratively determined figure, used in the manufacture of the AG–44 coats must be excluded in stating the dollar

106

amount of plaintiff's renegotiable sales and in calculating its renegotiable profit as a percentage of sales, in order to give effect to the quoted regulation.

The trial judge took the view, mostly contrary to defendant, that the value of GFP should be included in figuring the profit percentage, making an adjustment for the fact that plaintiff incurred no inventory financing cost for the fabrics it acquired under the bailment system. Apparently, the trial judge agreed with the notion that a firm may make a profit on the materials it purchases as well as on the manufacturing services it performs, and that the board's regulation simply advised discounting the firm's profit to the extent that it did not bear the risks and responsibilities of an outright purchaser of materials. This is plaintiff's view, though plaintiff does not agree with the trial judge's exclusion of one-fourth of the GFP value. It argues instead that the total value must be included in the sales figure and the percentage profit calculations, pointing out that neither party submitted evidence directed toward, or contended for, the partial exclusion of GFP value to approximate the inventory financing expense said to have been saved.

■ To resolve the foregoing controversy, we must determine whether a GFP "bailee" bore virtually the same burdens and derived the same benefits in the handling of the GFP as would a purchaser of raw materials. A negligible difference between the two requires that the GFP be accounted for in the same manner as materials purchased. This is the thrust of the board's regulation and of the Tax Court's opinion in *Winfield Mfg. Co. v. Renegotiation Bd.*, 57 T.C. 439, 450–52 (1971).

The GFP bailment system under which plaintiff operated supplied the contractor with needed materials without requiring a cash outlay. Thus, the contractor was relieved of both the necessity and the opportunity of locating a component supply source and arranging for the payment of the supplier. These characteristics were common to both the bailment system and

the so-called "free-issue" system, the latter used until 1957. Under the free-issue system, discussed in *Ellis Coat Co. v. Secretary of War*, 9 T.C. 1004, 1016 (1947), the Government specified the amount of GFP that could be used in each end-item contract that involved GFP. So long as the contractor held his total GFP consumption within the specified tolerance, the quantity of GFP that he used had no impact on the profits he realized from performance of the contract. Even as the contractor had little incentive to economize on GFP usage, the Government bore the expense of voluminous record-keeping on the GFP as well as of the maintenance of a large force of field personnel to supervise the return of unused GFP upon the completion of contracts. The free-issue system, generally regarded as inefficient and unsatisfactory, was eventually abandoned in favor of the form of bailment of GFP under which plaintiff worked in the review year.

■ The central feature of the bailment system was that of placing squarely on the contractor the entire risk of end-item yield from GFP. Thus, the contractor assumed all the economic benefit or burden resulting from the efficiency with which he utilized GFP in his manufacturing process. The contract no longer referred to an amount of GFP that could be consumed, but rather, the invitation for bids (made a part of the contract) described the physical character of the GFP, a price per unit (such as per yard) of GFP, and a single dollar figure that would be deducted, for payment purposes, from the contract price of each delivered end item. The contractor was responsible for determining prior to contract award the quantity of GFP projected for consumption during performance, and for including this in his contract price calculation; though he would take the Government's GFP dollar figure per end item into account in making this final price calculation, he could not rely on its accuracy, as he was warned in the invitation.

As the GFP was issued to the contractor after award of the contract, the Government debited a material account established

for him at the price per unit times the number of units issued, and he in turn transported the GFP to his worksite, at his own expense and under his own arrangements. While the GFP remained in his custody, the contractor bore the entire risk of loss on it, the Government maintaining only a security title in the goods. Upon delivery and acceptance of contract items, the Government credited the contractor's material account at the agreed dollar figure per end item. At the conclusion of performance on a contract, the contractor was charged with any debit balance in the material account, or alternatively was paid for any credit balance. Again, the end-item dollar figure was administratively set and did not necessarily reflect the actual GFP consumption per item, and so the usage of more GFP than projected by the contractor in calculating his total contract price could likely reduce or destroy his estimated profit margin. For purposes of establishing the final material account balance, the contractor returned the GFP issued but not used; the bailment system terms required this return, and placed the arrangement and expense of it upon the contractor. However, the contract permitted neither return of nor credit for the GFP incorporated into unacceptable end items, so-called "irreparable rejects," or incorporated in work-in-process upon a valid default termination.

The foregoing shows an allocation of benefits and burdens tantamount to those assumed by one who commercially purchases the materials he uses in manufacturing goods. The allocation contrasts sharply with the free-issue system's distribution of risks and benefits, meaning that we cannot rely on the holding in the free-issue *Ellis Coat Co.* case, *supra,* excluding the value of GFP from the sales base, for guidance in determining the proper mode of accounting for GFP under the bailment system. In addition to the burdens normally assumed by a materials purchaser, the bailment system placed upon the contractor the obligation of accepting up to 10 percent of the GFP in "short pieces" without compensation for any extra costs entailed in working with them, along with the duties of storing and accounting for the GFP separately from the rest of his inventory and of allowing the Government access to it at certain times.

Defendant would have us weigh against the above facts several points which it says favored the contractor, supposedly subjecting him to less risk and expense than would be the case with a purchaser of materials. Under the bailment system's terms, according to defendant, plaintiff "was insulated from the vagaries of the marketplace in the acquisition of basic fabric," presumably meaning that plaintiff could depend upon the Government as a ready and sufficient source of supply, and that the material price was effectively guaranteed not to rise between the date that price negotiations were concluded and the time that commercial supply commitments (were they to be used) could be secured. The protection provided against a component price rise would undoubtedly be advantageous to the contractor, particularly in a tight materials market, and in the same kind of market a reliable source of supply would likewise favor the contractor considerably. However, it is not apparent from the record that plaintiff would have experienced problems in obtaining a steady supply of needed fabrics, particularly if the Government had remained out of the material supply market, or would have incurred more than negotiable costs in locating that supply. Moreover, that dependence upon a sole source supplier, whether the Government or a commercial firm, is not necessarily an advantageous circumstance to be in, especially when disputes arise over the timeliness or quality of supply, for the contractor does not then have the opportunity to seek out an alternative supplier. Defendant must adduce proof, which it has not done, rather than make conjectures, in order to establish an advantage here. We should not rush to find a significant advantage in the dependability of the Government as a supply source.

The bailment system also favored the contractor, according to defendant, because the contractor took possession of the mate-

rials without having to pay cash for them. The trial judge agreed with defendant that the contractor received an advantage in being relieved of inventory financing costs on the fabrics supplied under the system. However, this reasoning, while attractive on the surface, finds no support in the facts of this case. On numerous occasions during the trial, plaintiff's officers and various of its suppliers testified that it was common practice in plaintiff's industry for suppliers who sold component materials to plaintiff and like operators to await payment for those materials until after the contractor was itself paid for the end items it delivered. This was as true for Government contracts as for commercial orders, even though the former at times required longer waiting periods between component shipment and receipt of payment therefor. When a bank or factor entered the picture, as assignee of the Government contract proceeds, the material suppliers still waited for payment until finished goods were delivered to and paid for by the Government.

The trial judge did not find to the contrary, and again it must be remembered, it is defendant's burden to bring forward sufficient proof to persuade the court, by a preponderance of the evidence, that plaintiff did derive some advantage from the bailment system in the nature of an interest-free loan. Defendant did not do this, but left plaintiff's showing on extension of credit for the materials it bought virtually unrebutted, relying solely on the theory of advantage constructed from the operation of the bailment system and its assumptions about credit for materials in plaintiff's industry. Defendant also did not suggest any dollar figure approximating the alleged financing cost forgiveness; the deduction used by the trial judge was his own invention. The trial judge's finding of fact that plaintiff derived interest-free credit for its inventory financing under the bailment system beyond what it otherwise could have obtained as a purchaser of materials, and that exclusion of one-quarter of the total GFP value for the review year from the net renegotiable sales figure was appropriate to compensate for this advantage, must be dis-

allowed as indulging in assumptions not supported in the record and against the weight of the evidence. Plaintiff has overcome the presumption of correctness that normally attaches to the finding of a trial judge under our Rule 147(b) by making the showing required in *Bonnar v. United States,* 438 F.2d 540, 563, 194 Ct.Cl. 103, 146–47 (1971), quoting *Davis v. United States,* 164 Ct.Cl. 612, 616–17 (1964). On the facts in this case, it cannot be said that any advantage accrued to plaintiff by virtue of the fact that the bailment system did not charge plaintiff a fee for financing part of its inventory.

On balance, we conclude that, on the facts of this case, the value of the GFP should be taken into the net renegotiable sales figure and included in calculations of renegotiable profit as a percentage of sales, to place plaintiff in parity with a manufacturer that purchases all the materials it uses. This aligns with the board's regulation, cited at the outset of this discussion. Under the bailment system, the contractor who works with GFP bears at least as many risks and burdens as the manufacturer who uses only materials he has purchased. Defendant cites *Winfield Mfg. Co. v. Renegotiation Bd., supra,* in support of a contrary conclusion, and indeed, the Tax Court did reach a result in that case different from ours as regards the costs of locating and financing the acquisition of materials. The court concluded that the GFP recipient did not assume burdens of finding and financing inventory as great as those borne by a materials purchaser. However, the plaintiff in *Winfield* had the same burden of proof, under the Tax Court's rules, as does defendant in this case, *see Lykes Bros., supra,* and so it is not surprising that a failure of proof on exactly the same point leads to an opposite result. We view *Winfield* as the product of the plaintiff's failure there to elicit sufficient proof to persuade the court that its material acquisition costs would not have been greater in the commercial marketplace than under the bailment system, just as we reach our conclusion in part because defendant has not es-

tablished that the acquisition costs would have been greater. To the extent this does not account for the differing results in the two cases, we simply state that we believe our analysis of the allocation of benefits and burdens under the bailment system to be the correct one, on the facts presented to us in this record.

It should not be understood, from the above discussion, that inclusion of the GFP value is now the invariable rule for the renegotiated contractor's net renegotiable sales and percentage profit figures no matter how the figures with which they are later to be compared are constituted. Rather, the rule is that, in making comparisons between plaintiff and other firms, materials purchased or considered as if purchased by plaintiff (including the GFP) must be accounted for in the same manner as materials purchased or properly treated as purchased by the compared firms. This does no more than admit that a contractor may realize a profit on materials he has purchased for use in making his products. If, for example, plaintiff is compared with a firm, in the analysis under the statutory factor "reasonableness of costs and profits," that deals solely with commercial customers and that purchases all of the components that it includes in its products, then the value of the GFP used by plaintiff must be included in its sales figure. And where the comparison is with a fellow AG–44 coat manufacturer, whose GFP value is excluded in stating the renegotiable sales figure, plaintiff cannot properly include the GFP value in its figure. If, however, plaintiff is compared with a firm that excludes the value of its materials since it cannot be considered a purchaser of the materials, such as an operator who relies on the customer to supply the materials and likewise to assume all responsibility therefor, plaintiff's net renegotiable sales must nonetheless include the GFP value. This is true because plaintiff *is* considered a materials purchaser, and only when a compared firm that is also viewed as a purchaser excludes the value of its materials can plaintiff properly do so.

Having set forth the environment in which plaintiff operated in the year under review, we move on to consider the remaining statutory factors.

■ (2) *Net Worth and Capital Employed.* Section 103(e)(2) of the Act directs that a determination of excessive profits take into account "[t]he net worth [of the renegotiated contractor], with particular regard to the amount and source of public and private capital employed." Neither the parties nor the trial judge considered in much depth the data involved under this factor, aside from the role of the GFP bailment system in plaintiff's manufacturing operation, already discussed above in detail. Apart from that system, plaintiff provided, by equity funding and some borrowing, all the capital used in running its business. Certainly, if the GFP be viewed as a contribution by the Government to plaintiff's working capital—a dubious assumption in light of the discussion above on inventory financing—the risks and burdens that the bailment system's terms placed on plaintiff hardly justify saying that the Government made the contribution without receiving anything in return. Though a contractor's heavy reliance on public capital provided for his use without charge argues against his receipt of as great a profit as a contractor making a similar product in a similar volume using private capital, as it is one of the purposes of the net worth factor to point out, *see* 32 C.F.R. § 1460.11(b)(4) (1968), this is not a case of such reliance. Since net worth and capital employed were not further considered by either party or by the trial judge, in measuring normal earnings or otherwise, we will not treat of the matter hereafter.

■ (3) *Reasonableness of Costs and Profits.* Determination of the excessiveness of profits must also take into consideration the "[r]easonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products." Section 103(e)(1). The Act requires that the

reasonableness of profits [3] be considered because, unless it is decided that the renegotiable profits were not competitively set, and that they rose substantially above the competitively fixed profits of comparable firms, there can be no finding that excessive profits were realized. That the touchstone of this statutory factor is price competition, and that its term "reasonable" should be read to mean "competitive," is understood from the primarily economic nature of the Act.

Statutory renegotiation stems from the premise that "accurate pricing and the control of contractors' profits cannot be achieved during a build-up of production for defense of war." *Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d 1341, 1346–347, 207 Ct.Cl. 106, 115 (1975). The careful cost analysis and forecasting that usually accompanies negotiated procurement sometimes falters in time of war, as demand for various goods and services suddenly rises to a level that outstrips industry capacity and overwhelms procuring agents. If the inordinately high demand is not sufficient to create a seller's market in the extreme, then the knowledge that the demand is short-term and will just as suddenly fall off surely accomplishes the task. Of course, pressed by the exigencies of war, the Government is unlikely to refrain from purchasing needed supplies and work even though the price is suspiciously and distastefully high. The result, not surprisingly, is the evaporation of price competition, and the consummation of sales to the defense agencies much higher in price than a competitive market would have allowed. The Government thus relies upon the expedient of renegotiation to recoup the price differential, *Mason & Hanger-Silas Mason Co. v. United States, supra.* The defense demand will neither wait, nor will it provide the incentive, for enough new productive capacity to be opened up (because of the attraction of the profits) "to drive prices down and eliminate 'abnormal' prof-

its," thus serving to "preclude continuing and excessive profits" as typically done in the competitive marketplace. W. Baumol, *Models of Economic Competition,* in Price Theory 288, 299 (H. Townsend ed. 1971). Renegotiation merely seeks to reconstruct the competitive price to the Government, and the competitive profit for the contractor, that negotiation would have produced absent the suddenness of the wartime demand on the marketplace.

By directing inquiry into the reasonableness of profits, the Act says in effect that a profit figure cannot stand if it was not competitively determined. Thus, the renegotiation process must disregard the renegotiated contractor's profits where these have not been competitively fixed, and as well may not consider, in making comparisons of profit levels within the contractor's industry, the earnings rates of firms not operating in competitive markets. When the statutory factor prescribes that profit reasonableness is to be weighed by paying regard to the size and change in production volume, the typical or "normal" earnings in the contractor's history and industry, and the likeness of renegotiable and commercially marketed products, it not only confirms the economic, competitive thrust of the factor, but also admits that deciding whether competition exists is not always without difficulties. *See A. C. Ball Co. v. United States,* 531 F.2d 993, 1014–015, 209 Ct.Cl. 223, 260–62 (1976). By assembling data on production volume, normal earnings, and product similarity, the renegotiator can determine if the prices and profits of the renegotiated contractor, and of other firms with which he is compared, were set by adequate competition. For example, the maintenance or rise of the customary rate of return over a vastly expanded volume of production may well show, absent the introduction of risks not previously compensated, that the producer is not subject to the restraints of price competition, *see Mason & Hanger-Silas Mason Co. v. United States, supra,* 518 F.2d at 1361–363, 207 Ct.Cl. at

**3.** The "reasonableness of costs" is more concerned with the assessment of relative efficiency, *see* 32 C.F.R. § 1460.10(b)(1) (1968), and so will be discussed under the efficiency factor, *infra.*

139–43, whereas considerable difference in manufacturing complexity between a renegotiable product and a commercial product cautions against drawing inferences about competition from a close comparison of their respective earnings levels. By thus analyzing the performance records of the renegotiated contractor and of compared firms, one can learn whether their profits may be sustained or used in a comparison because they are competitive or "reasonable," or whether they should be rejected because noncompetitive.

Beyond the task of focusing attention on the competitive nature of the profit figures, the profit reasonableness factor performs a second key function in renegotiation. In this role, the factor directs that the gathering of data identify (a) the firms whose size, products, and overall business operations were, in the time frame of the review period, sufficiently similar to plaintiff's that they may be considered "comparable," (b) the extent of that similarity, and (c) the comparable firms' profits in that time frame. The gathered data should disclose the full range or hierarchy of profits in the renegotiated contractor's industry, with which plaintiff's profits may be compared to ascertain whether they are excessive, and if so, by how much. The statutory factor directs that such a comparison be made as part of the renegotiation process when it says that "normal" profits should be taken into account, meaning in part that the renegotiated contractor's profits should be matched with the profits of similar firms known to be functioning in a competitive market, to measure the existence and extent, if any, of the contractor's aberration. "A reasonable profit can be established only on a comparative basis because it is impossible to say what a particular product or service is intrinsically worth." *Aero Spacelines, Inc. v. United States, supra,* 530 F.2d at 353–54, 208 Ct.Cl. at 753. It is not sufficient, however, that the comparison be made only between the contractor's profits and industry averages or medians—a range of industry profits, reflecting the varying efficiencies and risks of member firms, must be identified for comparative purposes. In *A. C. Ball Co. v. United States, supra,* 531 F.2d at 1013, 1016–017, 209 Ct.Cl. at 259, 263–66, we focused upon a profit range, not a mid-range figure, to measure the excessiveness of the plaintiff's earnings. The importance of disclosure of the full range, including the highest and lowest profits in the industry, is apparent from that case, in which we found that the plaintiff, though functioning in a market where price competition was not wholly adequate, could earn a reasonable profit at the very top industry rate, partly because the Government failed to show that a lower profit was in order, and partly because the plaintiff demonstrated that it performed with great efficiency while assuming many risks.

The seemingly diverse functions of the statutory factor, ascertaining the state of competition and constructing a comparative profit structure, are reconciled at this point—another firm's profit level cannot be considered reasonable, and therefore be useful in a comparison to determine excessiveness, where it was not itself competitively set. A practice of measuring the reasonableness of a contractor's profits against the noncompetitive profits of others is too futile to warrant condemnation. This is not to say, of course, that every noncompetitive profit contains an excessive portion, for a contractor need not exploit his market power to the fullest even though the impact of defense demand on his industry gives him that power. Only after all the statutory factors have been considered, *A. C. Ball Co. v. United States, supra,* 531 F.2d at 998, 209 Ct.Cl. at 232–33, the contractor has been "located" on the industry profit hierarchy, and the profit reasonable for him at that point on the hierarchy is measured against his actual earnings, can it be known whether any part of his profit was excessive.

The record shows that there was little or no price competition among the producers of OG–107 and AG–44 coats in FY 1967 and FY 1968. The trial judge found that a strong commercial market existed in the clothing industry during this

period, which meant that most of the productive capacity in the industry was already committed when defense procurement officials first sought to place their orders for the coats. In turn, this meant that these officials, to place the orders at all let alone obtain priority production, were forced to resort to the issuance of rated orders. The great bulk of the AG–44 coats delivered in FY 1968 were produced under rated orders. Though a negotiation would follow the placement of the order, to fix the contract terms and price, procurement officials would have to agree at least to meet the contractor's regularly established price or terms of sale or payment in order to maintain the legally compelling nature of the order under the Defense Production Act. This situation was far removed, indeed, from procurement by competitive bidding. Rather, it is reminiscent of the state of competition we found in *A. C. Ball Co. v. United States, supra,* 531 F.2d at 1014, 209 Ct.Cl. at 260, though without even the indicia of competition present there:

> The contention that procurement for the Vietnam war caused a decline in competition in 1967, is not, however, so readily to be dismissed. The year under review was a period of greatly increased military procurement for the war in Southeast Asia, * * *.

> With the increase in Government procurement for war it was inevitable that there would be fewer bids or bids at higher prices by contractors already busy to capacity and beset by wartime scarcities of labor, materials and shop capacity. As procurement expanded, competition waned and prices and margins of profit necessarily rose. Profits from this source are the objective of the Renegotiation Act, * * *.

In these circumstances, it is not to be assumed that plaintiff's earnings in FY 1967 and FY 1968, or those of other military coat manufacturers who themselves received or whose market was influenced by rated orders, were competitively determined. The potential for excessive profit-taking existed in the marketplace for OG–107 and AG–44 coats in the review year and the year preceding it.

Both parties brought forth data on the firms and their profits with which plaintiff and its review year renegotiable profits could properly be compared. Unfortunately, the data of neither side is entirely satisfactory for the construction of a comparative profit hierarchy. Though not mentioned in the trial judge's opinion, plaintiff's evidence showed that it earned a 15-percent profit on all its sales in FY 1967, covering both commercial and renegotiable work and including GFP, and that the six other firms which both manufactured AG–44 coats during the review year and were subjected to review by the board earned an average return on renegotiable sales (excluding the value of GFP, according to board practice) of 19.63 percent before renegotiation. Its evidence further showed that three of these firms, the ones which the board required to make refunds, were permitted to retain profits of 12.8 percent, 13.2 percent, and 25.1 percent of sales. In its reply brief, plaintiff forewent reliance on the FY 1967 profit figure, claiming instead that its past earnings were not truly comparable to those of the review year due to the differences in the products manufactured. It is of more than passing interest that this change in position occurred after defendant's brief pointed out that the 15-percent figure was composed of a commercial loss coupled with a 46-percent profit on renegotiable work that was not adjusted by the board because a statutory floor forbade lowering plaintiff's renegotiable sales receipts below $1 million. *See* § 105(f)(1), 50 U.S.C. App. § 1215(f)(1) (1970). The demise of the argument based on the FY 1967 figure is just as well, for the derivation of the renegotiable profit from sales not competitively priced, but based on a rated order, make the figure of little or no use for purposes of constructing comparisons to determine profit excessiveness.

Plaintiff has not, however, retreated from its position that the profits of the other AG–44 producers reviewed by the board, and their profits alone (see discussion

in this section, below), should be compared with plaintiff's to assess the reasonableness of the latter. It is not clear on the record how plaintiff arrived at the 19.63-percent calculation. But it is certain that most of the firms whose profits underlie that calculation earned those profits producing AG–44 coats under rated orders, and that the others did so in the same tight market. Just as in the case of the FY 1967 profit figure in plaintiff's own business, the 19 + percent average profit is of practically no help in constructing a picture of reasonable returns with which to compare plaintiff's review year earnings, for it cannot be said that it derived from competitively priced sales. Further, the calculation yields only an average figure, which is of limited utility for the reasons stated below in the discussion of the defendant's comparative profit figures. The trial judge did not err in disregarding this average profit calculation.

Defendant, speaking through its expert witness, Dr. Long, presented evidence and an analysis showing, in Dr. Long's opinion, that $900,000 of plaintiff's review year profit was excessive. The witness focused, not on plaintiff's prior earnings history, which he apparently considered abnormal, but on profits of other firms that he thought comparable to plaintiff, earned in or near the review period. Dr. Long chose Standard Industrial Classification (SIC) Nos. 2310 and 2311 as the prime indicators of the profit figures that could properly be compared with plaintiff's earnings. The trial judge correctly found that these two categories, which are practically identical [4] save in respects not relevant here and which encompass some 2,700 manufacturers of men's and boy's suits, coats, and overcoats, included the firms most similar to plaintiff in products and manufacturing operations for present comparative purposes. Defendant's expert then reviewed various profit statistics available in defendant's documentary evidence. According to the

trial judge's findings, the figures which the expert singled out were: 1.55-percent median after-tax profit expressed as a percentage of net sales, reported in a Dun & Bradstreet survey of the 1967 earnings of 125 firms that accounted for more than 50 percent of the total domestic sales volume of the manufacturers included in SIC 2311; 4.5-percent to 4.8-percent average before-tax profit on net sales, based on a sample of about 300 firms' corporation income tax returns filed with the Internal Revenue Service, as reported under SIC 2310 in the IRS *Corporation Source Book of Statistics of Income* for the fiscal period July 1967 through June 1968; and a 1967 median net before-tax income of 2.9 percent of net sales, drawn from an Ernst & Ernst survey of nine unidentified manufacturers of men's suits, coats, outerwear, jackets, and sweaters having sales of less than $6 million, prepared for the American Apparel Manufacturers Association.

Dr. Long also noted in his testimony, not mentioned by the trial judge, the earnings of four firms reporting their 1968 renegotiable receipts and profits, before taxes, to the board and classified under "Coats (SIC 2311)" by the board, apparently none of which manufactured the AG–44 under a rated order: Bonham Manufacturing, Inc., which realized a 4.5-percent return on $3.2 million sales; Rolane Sportswear, Inc., 6.5-percent return on $3.0 million sales; Marcie Dale, Inc., 3.2-percent profit on $3.7 million sales; and Rapid American, 4.3-percent rate of earnings on $2.9 million sales (sales figures excluding GFP). He said he thought these firms useful for comparative purposes because their sales volumes more closely resembled plaintiff's than did those of other firms reporting 1968 earnings, and because volume is significant in that it "determines how much and how well you can spread fixed cost." Based on the foregoing, and particularly the IRS data, defendant's expert said that a return of $180,000 to plain-

---

**4.** SIC 2311 is the United States Commerce Department's classification for makers of suits, formal wear, dress and sport coats, topcoats, vests, tailored coats, and uniforms for men and boys, SIC 2310, which closely tracks the above according to Dr. Long's testimony, is the Office of Management and Budget's standard enterprise classification, used by IRS.

tiff on its FY 1968 renegotiable business would be reasonable, in keeping with the compared profit figures, and giving due allowance for plaintiff's efficiency; no "favorable consideration" was thought due under any other statutory factor. He characterized this as leaving plaintiff with a 5.4-percent return on net renegotiable sales, excluding the value of GFP.

■ The trial judge accepted Dr. Long's analysis as basically correct, and applied the 5.4-percent profit rate to plaintiff's net renegotiable sales to reach a reasonable earnings figure. As noted before, he deviated from Dr. Long's approach by including part of the GFP value in the sales base; he also made several other adjustments, discussed hereafter. Plaintiff has objected that defendant's expert and the trial judge relied on irrelevant data in drawing their conclusions about profit excessiveness, pointing to the alleged remoteness of many of the firms in SIC Nos. 2310 and 2311 from plaintiff's sales volume, asset size, and type of product and manufacturing operation. Rather than focus on this data, plaintiff now insists, the inquiry into excessiveness should have looked, and looked only, to profit statistics drawn from firms more similar to plaintiff in all respects considered under the character-of-business factor, especially the product type. In other words, plaintiff would limit the comparison to the other AG-44 coat manufacturers. However, the groupings of firms singled out by defendant's expert are not irrelevant per se, but only would become so if adjustments were not or could not be made for the differences between them and plaintiff. In renegotiation, the comparability of firms and industries depends upon their similarity to the renegotiated contractor in such areas as the type and extent of risks undertaken and the entrepreneurial skills employed, and not solely and dogmatically upon the likeness of the product type. Cross-elasticities of product demand do not assume the importance in renegotiation that they do in antitrust law; though the AG-44 coat was no doubt different from and more difficult to make than most other garments, it does not follow that the variant risks and skills

involved cannot be taken into account in arriving at a reasonable profit figure. *Aero Spacelines, Inc. v. United States, supra,* 530 F.2d at 356, 208 Ct.Cl. at 756–57. The finding of factual similarity of the compared groupings is not erroneous, as stated before, but comports with the basic similarity required by the data noted under the character-of-business factor for comparability, and so profit statistics drawn from the firms in these groupings may be used in this proceeding.

It is a different matter, however, to approve the reliance of defendant's expert and the trial judge on the statistics taken from the compared firms. Dr. Long focused, for the most part, on median and average profit figures. High and low quartiles, and top and bottom extremes of the industry profit ranges were not considered, nor apparently were the differences between the risks assumed by, and skills required of, plaintiff and the compared firms taken into account. All were lumped together in one great mass. But, as we said in *A. C. Ball Co. v. United States, supra,* 531 F.2d at 1015, 209 Ct.Cl. at 263, "[n]o rule or principle says that the profit made on the highly efficient production for war of good quality materiel in volume is excessive when it exceeds the contemporaneous statistical average profit of comparable industry, composed of good, bad and indifferent producers."

■ Defendant cannot establish that excessive profits were realized simply by pointing to industry profit averages and medians and noting that the renegotiated contractor's profits came in above them. A reasonable profit rate will vary among contractors producing the same product, with the same risk and efficiency, depending upon the volume of sales, though no consideration was accorded this fact by defendant's expert save in the case of four compared firms, discussed below. *See Mason & Hanger-Silas Mason Co. v. United States, supra,* 518 F.2d at 1362–363, 207 Ct.Cl. at 142–43. The reasonable profit will also differ from one firm to the next as the risks

assumed differ, and from one product to the next as the manufacturing complexities differ. It will not be the same for all producers because they vary in efficiency; the projection of the renegotiated contractor's reasonable profit must take his efficiency into account, and should not do so by guess or unarticulated opinion, one of which was the case with defendant's expert, but rather by reference to the profit of a similarly efficient compared manufacturer. This, of course, cannot be done when only average and median profit figures dominate the record. The careful comparisons called for by the statutory factors between the character, risks, and efficiencies of plaintiff's and other firms' businesses in order to ascertain a reasonable level of profit for plaintiff, have all been swept aside in defendant's expert's analysis. They are now precluded by a lack of data on industry profit ranges and by a lack of inquiry into the business character, risks, and efficiencies of the firms located on those industry ranges. In substitution for those careful comparisons, defendant has elevated a statistical profit norm to a place of primacy, adjusting it for efficiency in a manner that remains mysterious on the record and in the trial judge's opinion.

■ Obviously, the trial judge's conclusion on profit excessiveness, being so heavily reliant upon the expert's erroneous methodology, cannot stand. Neither excessiveness of profits, nor the extent of that excess, can be shown without resort to location of the renegotiated contractor on his industry's profit hierarchy. When only profit averages and medians appear in the evidence and expert analysis, the renegotiated contractor cannot be located on his industry's hierarchy and the reasonableness of his profits thereby measured, unless of course it is otherwise established that the contractor belonged at the average or median point on the scale. This has not been proved regarding plaintiff in the present

case, and the court will not assume that the contractor before it is merely average. *A. C. Ball Co. v. United States, supra,* 531 F.2d at 1016–017, 209 Ct.Cl. at 264–66.

There were other problems in the expert's and trial judge's reliance on the profit rates they chose. For example, defendant itself suggests in its brief that the profit percentages available in the Dun & Bradstreet and Ernst & Ernst surveys and the IRS data excluded the value of customer-furnished materials from the sales base over which the percentages were calculated. While the absence of risks and responsibilities growing out of their possession of the materials would justify this accounting practice by industry firms that used such materials—and defendant further suggests that most firms included in the profit percentages did use customer-furnished materials—the inclusion of materials value by plaintiff and the exclusion of that value (at least in part) by firms plaintiff is sought to be compared with, would distort such a comparison. A different overall rate may well apply to firms that include the value of materials in their sales base.[5] It would not be appropriate to adjust for the profit rate difference growing out of the exclusion of materials value by simply removing the GFP value from plaintiff's sales figure, however, for this would still leave unaccounted for the difference in risks between plaintiff and the firms using customer-furnished materials. Another problem with the profit rates utilized by defendant's expert and the trial judge lies in the fact that the expert characterized his "reasonable" profit of $180,000 for plaintiff as a 5.4-percent return on sales. The trial judge proceeded to apply this percentage over the sales base he thought appropriate, yet this percentage was erroneously calculated by the expert on a sales base that included the alleged $900,000 excessive profits. The rate would have been 7.44 percent were the al-

5. That rate may be lower than for other firms because a lower profit percentage on the materials purchased and then resold in the manufactured product may be anticipated by the firm including the materials in its sales figure. This accords with the reasoning of the last sentence of 32 C.F.R. § 1460.14(b)(2) (1968), the board's regulation on profits of firms using customer-furnished materials.

**116**

leged excess removed (still excluding the GFP value, according to the expert's method).

■ In concluding this discussion, two other points are noted about the data brought in by defendant. First, the IRS-based profit percentages were, it is true, stated as a range, at first glance complying with the statutory factor's prescription of the kind of data needed and most useful. However, this range derives from different average figures calculated from two sets of tax return data, one that included only firms showing taxable income, and the other that covered firms with and without taxable income. Secondly, defendant's expert did cite the profits of four firms classified by the board as coat manufacturers within SIC 2311, and stated for each a volume of sales quite similar to plaintiff's. He was correct in thinking sales volume an important factor in his profit comparison—the absence of sales volume data is yet another defect in the average and median statistics that he used—for profit rates stated as percentages of sales will vary with the sales volume, as will the ability to spread fixed costs, a point mentioned by the expert. Though the sales volumes of firms need not be identical for comparison to be possible, the closer they are to one another, the more likely is the accuracy of the comparison. But if the likeness of the sales volumes, and the four firms' classification in SIC 2311 as military coatmakers, support the firms' profit comparability to plaintiff, there the data supporting comparability ends. It is not known what kind of coat, or what else besides coats, these firms produced for the Government, though they apparently did not make AG–44 coats. Little else is known about the character of the four firms' business operations, or their efficiencies and risks relative to plaintiff. The complexities of their manufacturing techniques cannot be weighed in these circumstances, to assess their degree of likeness to plaintiff. On balance, the earnings of this small sample do not appear particularly useful for comparative purposes, due to lack of information about the firms and products that produced them.

■ (4) *Efficiency.* The second sentence of the Act's section 103(e) reads in part: "In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower * * *." The renegotiated contractor's ability to meet and even exceed production schedules, to produce a greater volume of goods or services without enlarging his asset base or expanding his work force, and to decrease his controllable expenses, as well as his success in minimizing defects in his products, are significant indices of his efficiency. *See* 32 C.F.R. § 1460.9(b) (1968). Of course, efficiency in some absolute sense does not exist in any business. Timeliness, heightened production, cost control, and maintenance of quality, all as aspects of efficiency, are to be noted for plaintiff and for each firm with which it is compared, in order to assess their efficiencies relative to one another. Determining the efficiency of one firm in relation to another, and not in a vacuum, is the objective of this statutory factor. The ascertainment of relative efficiencies is critical in renegotiation, for the renegotiation process, like the competitive market, seeks to reward the more efficient contractor with a higher profit than his less adept counterpart, *ceteris paribus.* Much is often made of the point that Congress has directed "favorable recognition must be given" the more efficient contractor to avoid any possibility of penalizing him in the course of controlling profits, yet the congressional direction does no more than recognize that firms vary in efficiency and that their profits should likewise vary. The information gathered under this factor should show where plaintiff stands among comparable firms as a matter of efficiency, thus helping to locate it on the industry profit range.

■ Unfortunately, the parties and the trial judge in this case have addressed the data under the efficiency factor as if some

absolute determination, rather than a relative one, were the goal. Plaintiff was shown by the evidence to have produced high quality merchandise in very great quantity, completing some 3,000 AG–44 coats per week. Defendant has not complained about failure of plaintiff in meeting quality specifications or delivery schedules. There were but minor delays at the beginning of production. Plaintiff did increase its work force by about 50 percent over the previous year to perform its AG–44 contracts, and data relating to a decrease of the number of employees over the course of work in the review year, or relating to any decrease in costs, tending to show some degree of efficiency, was lacking in the trial judge's findings. Yet, the trial judge did expressly find that plaintiff performed its review year renegotiable work "capably, punctually * * *, and efficiently." Information on the reasonableness of plaintiff's costs would bear on its relative efficiency, for such information would show the competitiveness of plaintiff's production and overhead expenses with such expenses of comparable contractors and with the prices that the market had to offer, as well as show plaintiff's attempts to lower its costs over those experienced in previous production of the same item. See 32 C.F.R. § 1460.10(b)(1) (1968). But the competitiveness of plaintiff's costs is not known, and since plaintiff produced on a first procurement of the AG–44 coat, prior cost experience with that item was not available. The trial judge made no findings regarding the efficiency of firms in plaintiff's industry other than plaintiff itself, and neither party has excepted to a lack of findings here.

Given the general lack of data on plaintiff's relative efficiency, there is little way of locating plaintiff on an industry profit spectrum, or even of concluding that plaintiff should be ranked above or below an isolated comparable firm, let alone how far above or below in terms of earnings. Merely average efficiency will not be assumed, and the absence of proof that plaintiff was merely average cannot be remedied by defendant's unsupported assertion to that effect. Plaintiff has brought forth enough

information about its efficiency for it to be considered an efficient producer under the burden of proof rules in *Lykes Bros., supra.* Since defendant has not established the contrary, plaintiff will be viewed as one of the most efficient producers in its industry for purposes of measuring profit reasonableness. "Not having shown that plaintiff should be compared with the manufacturer at the bottom, mid-point or any particular point on the [industry profit] scale * * * the Government has proven only comparability with the manufacturer who made profits * * * at the top of the scale * * *." *A. C. Ball Co. v. United States, supra,* 531 F.2d at 1016–017, 209 Ct.Cl. at 265.

■■■ (5) *Extent of Risk Assumed.* Consideration must also be given to the "[e]xtent of risk assumed, including the risk incident to reasonable pricing policies" in determining excessiveness of profits. Section 103(e)(3). Congress, in requiring consideration of the risks borne by the renegotiated contractor and comparable firms, recognized that one purpose of competitive profit is to compensate the entrepreneur for the risks of financial loss and business failure he assumed in bringing his product or service to the marketplace. See P. Samuelson, Economics at 621–24 (10th ed. 1976). The statutory factor seeks to amass sufficient information to assure that all risks assumed will be identified and adequately compensated, while being careful not to compensate one contractor at a higher rate than another for bearing the same risks. Thus, when the profits of comparable firms are matched with the renegotiated contractor's earnings to measure the reasonableness of the latter, the presence of risks common to all will not entitle the contractor to more or less profit than is merited by an otherwise comparable firm; compensation for those risks, to the extent the market will permit, is already internalized in the comparable firm's profit figure. On the other hand, the contractor's assumption of risks greater than any comparable firm will require a greater compensation, other

things being equal.[6] Obviously, the assessment of risk under this factor is a comparative exercise, as was the case with efficiency. The ascertainment of relative risk-bearing is the goal, to aid in locating the renegotiated contractor on his industry's profit hierarchy.

Plaintiff ran a variety of risks in taking on the AG–44 work. It agreed to produce the coats under firm, fixed-price contracts, to guarantee the coats' delivery on dates and in numbers specified, and to warrant their conformity to the Government's demanding specifications, even though this was a first procurement of the AG–44. We said in *A. C. Ball Co. v. United States, supra:*

> An essential quality of the firm, fixed-price contract is that the contractor assumes responsibility for his costs, with the inevitable risk that greater costs will be incurred than were anticipated, and that the contract will result in loss rather than profit. * * *. The risk is intensified during the shortages which accompany war.
>
> \* \* \* \* \* \*
>
> There is more flexibility in commercial work than in Government supply as to prices, delivery dates and other contract provisions; * * *. Substitutions or departures from specifications are not permitted under the Government contract, at least not without burdensome applications which must commend themselves to the approval of the officers of the Government's procurement system. * * *. A miscalculation in a bid, a botched job by an engineer, a misread specification—any of these all too possible events may mean no profit or worse. * * *.
>
> *Dangers are particularly present when bidding on a product for the first time.* Every item bid on with which the bidder has little or no familiarity, either as to manufacturing process or bid history, presents a threat of loss. * * *. [Emphasis supplied.]
>
> \* \* \* \* \* \*
>
> Among the more burdensome obligations in the Government contract is that of the contract delivery date, buttressed by threat of termination for default, liability for excess procurement costs and, often, liquidated damages. * * *. [531 F.2d at 1007–008, 209 Ct.Cl. at 248–51.]

*And see* 32 C.F.R. § 1460.12(b)(1) (1968).

▮▮▮▮▮ The risks assumed by plaintiff on contract pricing, production volume, and quality and timing warranties were substantial indeed, especially in light of the fact that neither plaintiff nor any other producer had ever before undertaken to make the complex and costly AG–44 coats.[7] Setting aside the use of GFP, plaintiff supplied all of its own capital and placed this at risk to carry production on the coats forward, securing a large line of credit with a local bank and tapping this to meet payroll requirements. Plaintiff further assumed the risk of manufacturing a garment far more complicated in design and construction than most commercial garments, including those that it had made in the past,

---

**6.** This does not mean that because it is more risky for one firm, because of thin capitalization or inexperience, to produce a product than it is for another, that the former is entitled to greater compensation. Within the same product type, where production and marketing problems are known not to vary from item to item, competing producers should generally receive the same risk compensation, which is internalized in the competitive price. Though one out of these producers takes greater risks in bringing his product to the market, competition levels the price for all, thereby excluding additional profit for extra risk-taking. However, when firms producing differing products are compared for renegotiation purposes, it becomes essential to read their profit figures in light of their varying production risks, to avoid holding the contractor who bears a higher risk due to greater product complexity to the lower earnings rate of his lower-risk counterpart.

**7.** Though risks must be more than speculative to be considered here, they may be substantial even though they did not materialize. *A. C. Ball Co. v. United States,* 531 F.2d 993, 1009, 209 Ct.Cl. 223, 253–54; 32 C.F.R. § 1460.-12(b)(1) (1968). Substantiality of risk, then, is to be measured at the time the risk was assumed, not retrospectively.

and than most other clothing items procured by the military. Plaintiff's fellow AG-44 manufacturers assumed virtually these same risks, of course, save for their capital risks, which are not disclosed in the record. The extent to which other contractors classifiable under SIC 2310 or 2311 bore like risks is not discernible from the evidence, though their manufacturing complexities and associated risks appear to have been less than was the case with the AG-44 producers. As was true under the efficiency factor, where the risks assumed by other firms are not known and therefore cannot be weighed relative to the risks undertaken by plaintiff, a barrier is raised to the use of those other firms' profit figures in determining a reasonable profit for plaintiff.

One last risk that plaintiff is known to have run, but that no other firm is known from the record to have run, is that of the temporary sacrifice of its commercial markets. Plaintiff's alienation of the McGregor and Londontown accounts in order to accept the OG-107 and AG-44 business damaged to an irreparable degree the steady and profitable supplier-customer relations that had been built up over the years. Bearing witness to this damage were the commercial losses that plaintiff incurred in the review year and the subsequent year, which the trial judge found to have stemmed directly from the pre-emptive termination of the two commercial accounts; the trial judge's findings on the existence of the alienation and the cause of the losses were supported by substantial evidence and are adopted as correct. A board regulation observes: "In some cases a substantial degree of risk will be found in the temporary sacrifice of civilian markets to competitors, in order to accept more defense orders * * *." 32 C.F.R. § 1460.12(b)(1) (1968). Plaintiff clearly realized the risk of sacrificing its commercial accounts to other suppliers, and a competitively de-

termined profit for plaintiff would certainly compensate for this long-term sacrifice.[8] Defendant suggests that plaintiff merits no "favorable consideration" for this sacrifice because at least some part of it was voluntary, in that plaintiff need not have taken as much rated order business as it did, but could instead have continued to devote a portion of its productive capacity to its regular customers' work. This argument simply strays from the point, for it only matters that the risk existed. Where a risk is borne that is not compensated in any comparable firm's profit, it is nonetheless compensable by an upward adjustment of an otherwise reasonable profit figure for the risk-bearer, however judgmental in nature that adjustment must be. The trial judge's method of compensating plaintiff for the market sacrifice risks was to deduct from the portion of its profits determined to be excessive the amount of the FY 1968 and FY 1969 commercial losses. However, this approach should not be followed, and we decline to use it here, because it makes no effort to compensate the contractor for profits lost on the commercial work sacrificed, but only attempts to negate the deficits. *Cf. Butkin Precision Mfg. Co. v. United States*, Ct.Cl., 544 F.2d 499 (1976).

(6) *Contribution to the Defense Effort.* The last statutory factor to be considered provides that there be taken into account in judging profit excessiveness the "[n]ature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance." Section 103(e)(4). We explained in *Mason & Hanger-Silas Mason Co. v. United States, supra,* 518 F.2d at 1354–355, 207 Ct.Cl. at 128–29:

> * * * The contractor who performs a defense contract does not by that token make a contribution within the meaning

8. Compensating plaintiff for this risk does not run counter to the earlier observation, see note 6, *supra*, that added risks assumed by makers of the same product are not generally compensable. The fact is that a competitive price would indeed compensate for additional risks

undertaken to *expand total* industry *capacity* in a product, where a high but still unsatisfied demand had kept the industry busy to existing capacity. This was the type of risk that plaintiff undertook here.

of the Renegotiation Act. Favorable consideration is rather due a contractor for "superior performance" or "performance, assistance or service considered otherwise exceptional"; illustrations are "completion of urgent work ahead of schedule, or exceeding specifications" with benefit to the defense effort, "ingenuity in providing new uses" for products or equipment, "overcoming difficulties, which others have failed to overcome," or "experimental and developmental work of value to the defense effort," "new inventions, techniques, and processes of unusual merit," work under difficult or hazardous conditions, cooperation with the Government and with other contractors. Regulations, § 1460.13(b).

A footnote stated that the cited regulation, from which the opinion quoted, was adopted by the board in 1973, to replace a more tersely worded rule to the same effect framed in 1960. As the quoted passage suggests, the factor focuses attention on extraordinary actions of the renegotiated contractor, not in keeping with his industry's normal commercial practices, but existing to the substantial benefit of the defense agencies' work. Where such actions aid that work by inventiveness or risk-taking or special accommodation, and are not compensated by consideration under the other statutory factors, Congress has provided under this factor that they be rewarded even though the market would not respond to them with a profit increase. This is done by raising the contractor's profit, as a matter of judgment, above an otherwise reasonable level.

■ Plaintiff did nothing in FY 1968 that entitles it to a defense contribution credit. It claims that some allowance is due it in recognition of the fact that it performed under rated order contracts, sacrificing commercial customers, and the fact that it recommended the elimination of an operation in the AG–44's manufacture that saved the Government $0.23 per coat on a price of about $60 per coat (before renegotiation). However, mere performance of a Government contract lays no foundation for credit here, and the commercial market sacrifice was taken into account under the risk factor and will be considered in the concluding analysis by virtue of that factor. The $0.23 saving was not so great in magnitude, nor shown to have been the product of so much inventive or risk-taking effort, as to qualify plaintiff for a reward of exceptional performance, experimental work, or development of techniques of unusual merit. No adjustment will be made to plaintiff's otherwise reasonable profit on account of this factor. It is not known whether the board, in arriving at reasonable profit figures for any of the other AG–44 coat manufacturers with which plaintiff seeks to be compared, gave credit to any firm under this factor.

### Summary

The only profit figures in evidence that have any utility in the final determination of a reasonable profit for plaintiff are plaintiff's after-renegotiation profit rates for several of its fellow AG–44 coat manufacturers, and defendant's earnings figures on four other coat manufacturers whose work was subject to the Act and whose returns were cleared by the board. As we said earlier, the profit rates of the latter four coatmakers are accompanied by such a paucity of information about the firms that they are but marginally useful in constructing a comparison to measure the reasonableness of plaintiff's profit. Taken alone, they could not make out a case that plaintiff's profits were excessive. The 3.2-percent to 6.5-percent rates of return are calculated over a sales volume similar to plaintiff's, but they may well be significantly lower than a reasonable return for plaintiff, because, for all that appears in the record, the four underlying firms may have been less efficient than plaintiff, may have been producing items less complex in construction than plaintiff, and may not meanwhile have run the commercial market sacrifice risk that plaintiff did. We will not assume that plaintiff's efficiency, manufacturing complications, and market loss risks were at or below the level of the four firms defendant presented without much explanation, and indeed, we will not assume these to be

less than those experienced by the highest-compensated firm in plaintiff's industry—these firms clearly were not at the top of the renegotiable SIC 2311 manufacturers in earning capacity—absent contrary proof. The 3.2-percent to 6.5-percent rates can serve to establish the lower part of the reasonable profit spectrum in plaintiff's industry.

Far more important to drawing a conclusion about profit reasonableness here are the after-renegotiation profit statistics that plaintiff placed on the record, the ones representing the board's reworking of several other AG–44 manufacturers' earnings. These are more important precisely because the demonstrated closeness of the underlying firms' operations and risks to plaintiff make the figures more probative of what a comparable competitive profit would be for plaintiff. *Aero Spacelines, Inc. v. United States, supra*, 530 F.2d at 354, 208 Ct.Cl. at 753. We previously noted that the AG–44 makers' risks were virtually the same as plaintiff's, save for their commercial market loss risks, about which there is no information. There is similarly no mention in the evidence of their efficiencies relative to plaintiff, though an exhibit in evidence shows that three of the firms had sales volumes similar to plaintiff's. The other AG–44 manufacturers obviously were faced with the same construction complexities, stemming from the coat's design, as was plaintiff; if their production in the review year included items besides the AG–44, this does not appear from the record. Overall, if we are willing to make judgmental adjustments, absent a more comprehensive hierarchy of industry earnings, to allow for differences in efficiency and market sacrifice risk between plaintiff and these firms, their profit rates can be used to settle upon a reasonable rate of return for plaintiff on its AG–44 work.

▮ Two objections were voiced by defendant to the use of the AG–44 firms' profits here. The first objection is specifically directed against one of the profit figures, that of Leon Manufacturing Co., which the board left with a 25.1-percent profit on sales of $1.0 million. Defendant is correct that the board's figure lacks comparability in this instance. It is not clearly indicative of the full intention of the board because a statutory floor forbade lowering Leon's renegotiable sales receipts below $1 million. *See* section 105(f)(1), *supra.* This may well have left the profit rate above a level entirely satisfactory to the board, for the board's revision did indeed take the sales figure (in the course of elimination of part of the profits) down to the statutory floor. Thus, the figure which is suspected of including excessive profits, because determined in a marketplace of inadequate price competition, remains suspect because of the frustration of the board action attempting to purge the figure of such excessiveness, assuming the board action can remove such suspicion (see the discussion immediately below). So lacking the necessary indices of competitiveness, Leon's profit rate has little place in an inquiry into profit reasonableness.

▮ The second objection relates to the validity of using the remaining AG–44 firms' profit percentages, as well as the earnings rates of the four firms singled out by defendant's expert. The after-renegotiation profit figures supposedly eliminate any excessive profits realized in the firms' review year earnings, and so theoretically provide reasonable profits against which plaintiff's review year performance might be measured. The point that defendant presses is that the use of profit figures revised by the board, sometimes pursuant to unilateral order and sometimes to effect a compromise settlement, is of questionable propriety in a de novo redetermination proceeding. *See* section 108 of the Act, 50 U.S.C. App. § 1218 (Supp. V, 1975). Certainly, one difficulty in making use of these figures is our lack of full knowledge on the information the board had before it and the judgments and adjustments it made in the course of issuing orders and accepting settlements. But all the after-renegotiation figures, even those arising from settlements, make at least some attempt to reconstruct what the renegotiated contrac-

tors' profits would have been in a competitive market, and so are not totally lacking in probative value. The data available for comparisons in redetermination proceedings is frequently sparse and plagued with ambiguities and unknowns, yet the vital need for comparative data means that it is not to be disregarded completely without strong reason. *Mason & Hanger-Silas Mason Co. v. United States, supra,* 518 F.2d at 1363, 207 Ct.Cl. at 143–44; *Aero Spacelines, Inc. v. United States, supra,* 530 F.2d at 340, 208 Ct.Cl. at 729–30.

In that plaintiff is the one that has brought the several AG–44 manufacturers' after-renegotiation profits before the court, thus acceding to their probativeness in determining a reasonable profit for itself, we think we may safely use these figures. It was up to defendant to produce evidence of their lack of comparability, if it so desired. Defendant, of course, does not as freely enjoy the privilege of importing board-created profit figures into the record, for this would likely result in a boot-strapping operation, proving the propriety of board determinations on the basis of other board determinations. Such a practice would virtually obliterate plaintiff's right to de novo proof by defendant that plaintiff earned excessive profits. We do take cognizance of the after-renegotiation profit figures of the four renegotiable SIC 2311 firms placed on the record by defendant, but only in restricted circumstances here. The figures compose the lower end of the industry profit spectrum, and not the higher segment with all the significance that attaches to it in the event of a failure of proof on the renegotiated contractor's efficiency and risk, and the figures were not board-determined except insofar as the firms were issued clearances.

■ The other AG–44 manufacturers whose after-renegotiation profits were placed in evidence by plaintiff showed earnings, excluding GFP, of 12.8 percent on

$4.226 million in sales (Wales Mfg. Co.), 13.2 percent on $3.943 million in sales (Pembroke, Inc.), and 9.5 percent (a clearance figure) on $1.642 million in sales (Gentry, Inc.). Plaintiff did not single out this last figure in its survey of after-renegotiation profits, but since it said it included the underlying firm in the before-renegotiation average profit rate that it also offered to the court, we take it that plaintiff viewed the firm as comparable and we include the firm's profit in this discussion. The same figures, including the value of GFP, are (in the same order) 9.1 percent on $5.914 million in sales, 8.0 percent on $6.509 million in sales, and 7.7 percent on $2.016 million in sales. By comparison, plaintiff's net renegotiable profit of $1,001,462 [9] amounted to 30.2 percent of $3,318,050 in sales exclusive of GFP, and 21.9 percent of $4,564,248 in sales including the GFP value.

Plaintiff's renegotiable profit figure derives from net earnings on review year Government work of $1,079,962, less $78,500 in special deductions allowed by the trial judge. Defendant and plaintiff alike dispute allowance of these deductions, defendant because it believes them improper as a matter of law, plaintiff because it thinks them insufficient in amount. The allowances concern $28,000 in special tools that plaintiff had to purchase to be able to perform the AG–44 work, which the trial judge found useless to plaintiff upon cessation of that work at the close of the review year, and $107,000 in construction costs for a building that state authorities insisted that plaintiff build to provide sanitary facilities sufficient to accommodate its work force then recently increased to enable production of the AG–44 coats, which the trial judge found plaintiff largely unable to utilize in subsequent years. The trial judge's findings are supported by substantial evidence, and modification of plaintiff's accounting to bring about a clearer reflection of renegotiable costs is within the

**9.** Defendant has contended that this figure understates plaintiff's profits because the compensation paid by plaintiff to its three manager-owners was excessive in FY 1967 and FY

1968. The trial judge found the compensation figures to be reasonable, if not low, and as his findings are supported by substantial evidence, we have no occasion to overturn them.

court's authority. Section 103(f) of the Act, 50 U.S.C. App. § 1213(f) (1970).

 Items of cost are allowable in renegotiation which may be estimated as deductions under Chapter I of the Internal Revenue Code of 1954, as amended, and regulations thereunder. *Id.* The trial judge relied on section 167 of the Code and section 1.167(a)–9 of the regulations as authority for the equipment and building obsolescence deductions he allowed. While we question the use of the obsolescence provisions to deduct the value of plaintiff's equipment and building on the findings made, we are content to let those provisions stand as authority for the deductions since defendant has made no argument that the trial judge erred on the law.[10] Normally, a prospective estimate about the useful life of depreciable assets is the means by which an abnormally fast obsolescence is accounted for, as in plaintiff's situation. However, for purposes of renegotiation, we think it correct for the trial judge, on the facts of this case, to have adjusted plaintiff's accounts in retrospect, to match the true costs of performing the renegotiable work against the receipts derived from it. Though plaintiff may originally have estimated the useful lives of its special tools and building incorrectly, a refusal to adjust its accounts now would forever bar the proper matching of its renegotiable costs and receipts for FY 1968.

 Though the deduction of the special tools' and the building's costs against renegotiable receipts in determining profit will thus be allowed, the trial judge permitted deduction of only $25,000 out of the $28,000 in tooling expenses, and of only one-half of the building construction costs, totaling $78,500. His actions, based on findings of actual costs to plaintiff not shown to be erroneous, must stand. The $3,000 spread between the cost and the allowed deduction for the tools is understandable as an adjustment to account for depreciation already allowed against renegotiable

receipts and for salvage value. The 50-percent disallowance as to the building is likewise appropriate in that it appears to withhold credit from plaintiff to the extent that the building did have some residual value to plaintiff and that it was more capacious than required by the state authorities (the employees' washroom occupied less than 10 percent of its floor space, the remainder being devoted to offices and production area), indicating that plaintiff contemplated some other future use for it when it was constructed.

Plaintiff apparently brought in the after-renegotiation profit data on the (now three) AG–44 producers because it thought their operations and risks, and therefore their earnings, fairly comparable to what plaintiff itself would have made in a competitive market. It is true that plaintiff thought, as remarked in its brief, that some further upward adjustment of profit would be allowed it upon a finding that "favorable consideration" was in order on account of its efficiency. This of course misperceives the role of the efficiency factor in renegotiation, the proof under which may show one contractor to be relatively less efficient than an otherwise comparable contractor and so entitled to less in profit on the same volume of sales. Plaintiff is nonetheless in line to receive the highest credit for its efficiency, as noted before, because it has introduced evidence tending to show its efficiency sufficient to carry its minimal burden under *Lykes Bros., supra,* while defendant has failed to carry its heavier burden of establishing that something less than the highest credit is due. The greatest problem for the court, at this point, is that a comprehensive industry profit range is nowhere in the proof, meaning that the top industry reasonable earnings level is unknown, and meaning in turn that there is no way to locate plaintiff at a top earnings figure to compensate it for its efficiency (and various risks assumed not inherently compensated in the AG–44 manufacturers' rates of re-

---

10. Defendant has contended only that the record does not support the trial judge's findings that the equipment and building became useless to plaintiff, and not that this is insufficient to justify a deduction.

turn), save by engaging in a purely judgmental exercise.

Renegotiation is not a rate-making proceeding, conducted before an administrative body vested with considerable discretion. The court seeks to base its redeterminations of profit excessiveness upon hard evidence to preclude a foray into the realm of arbitrariness. *Aero Spacelines, Inc. v. United States*, 530 F.2d at 339–40, 208 Ct.Cl. at 728–29. Yet, the court is also bound to interpret and apply the Act in a manner consistent with the congressional purpose of remitting excessive profits to the public treasury. The facts in this case show both a market in AG–44 coats in which price competition was minimal at best, and a striking disparity between the profit figures that plaintiff itself introduced as reasonable and comparable to plaintiff's competitive earning power, and plaintiff's actual earnings in the review year. Differences between plaintiff and the comparable firms in efficiency and risks doubtfully justify the size of the profit gap in plaintiff's favor.

Renegotiation law is at an early stage in its development in this court. Parties to these factually and conceptually complex cases are not yet well informed as to the kind of proof required to make a convincing case one way or the other, for the court itself is still busied enunciating standards to guide the location and the weighing of that proof. In these circumstances, the court will undertake, however reluctantly, and for only a limited span of time, to engage in judgmental adjustments and reworkings of the data placed in the record in order to arrive at a finding of a reasonable profit for the renegotiated contractor—where the state of the evidence permits this to be done in a responsible manner, consistent with the purposes of the Act, as we think is the situation here, but compare *Aero Spacelines, Inc. v. United States, supra.* Here, according plaintiff due credit for its demonstrated (and not rebutted) efficiency and for the risks it bore beyond those that its fellow AG–44 manufacturers carried, and considering the profit figures that plaintiff itself brought into the case as evidence of

comparable competitive earnings, we think that leaving plaintiff with fully one-half of the rate of earnings it actually realized will place its FY 1968 earning capacity at that point on the relevant industry hierarchy where it would have been located in a competitive market situation. With the burden of proof resting on defendant, the evidence assuredly warrants no more stringent treatment of plaintiff than the above will provide.

Accordingly, plaintiff is found to have realized excessive profits of $560,000, after elimination of which plaintiff will retain a return on its renegotiable work of 16 percent of $2,758,050 in sales excluding GFP, and 11 percent of $4,004,248 in sales including GFP.

## CONCLUSION OF LAW

Upon the findings of fact which are made a part of the judgment herein, and for the reasons given in the opinion, the court concludes as a matter of law that for the fiscal year ended January 31, 1968, plaintiff and Major Clothing Co., as a consolidated group, realized excessive profits in the gross amount of $560,000 from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. Judgment is hereby entered on defendant's counterclaim in the sum of five hundred sixty thousand dollars ($560,000) less appropriate state and federal tax credits, plus interest thereon as provided by law, and it is ordered that plaintiff is entitled to a refund of the amount paid to defendant in excess of the judgment entered on the counterclaim, together with interest as provided by law.