Per Curiam:
This is a petition, originally filed in the Tax Court, for redetermination of the excessive profits of a joint venture for its accounting year ended December 31, 1963. The Renegotiation Board determined by unilateral order that petitioner realized excessive profits in the amount of $1,200,000, before tax credits, and ordered elimination of that amount under 50 U.S.C. App. § 1215. The Tax Court *251 petition was transferred here under Pub.L No. 92-41, 85 Stat. 97, 98, and we have jurisdiction under the same statute, which amended 50 U.S.C. App. § 1218.
The case was tried before Trial Judge David Schwartz, who has submitted a recommended decision and conclusion of law under Rule 134(h). He would reduce the determination to $778,036 and both parties except. After briefing and oral argument, the court agrees with the said recommended decision and adopts the same as its own, with minor corrections, and with a few added comments which here follow. We adopt as our own the findings of fact (except for the conclusion of law at the end, which is replaced by ours), but they are not printed herewith, having been furnished to the parties. All the most significant facts are stated in the opinion.
The plaintiff was formed to submit proposals for the single contract here in issue. The joint venturers were Page Communications Engineers, River Construction Corporation, Curran and Company, and Fischbach & Moore, Inc. The contract called for installation in South Dakota of the buried intersite cable communication system in one of the six wings of the intercontinental ballistic missile network known as the Minuteman. The original price, as bid, was $5,476,132, but there were numerous changes, and plaintiff suffered from numerous delays that were attributable to defendant, including delays in delivery of government furnished material. The defendant obligated much over the contract price from the very outset. Rather than a series of equitable adjustments, the parties decided to negotiate a single new fixed price. This was done in late April and early May 1963, and the new fixed contract price was $13,000,000, of which $1,152,000 was the estimated allowance for profit, equal to 8.8 percent of the agreed price. Throughout the negotiation, it was assumed and expected that the negotiated price would allow 10 percent profit on costs. By the date of this supplemental agreement, much of the work had been done and major problems overcome. The trial judge believed that plaintiff at the date of the negotiation could have estimated its costs for the entire job with approximate accuracy. The parties still debate what *252 uncertainties remained. Clearly there were some, but we do not consider it helpful to measure them exactly.
The plaintiffs entire revenues from the job were $13,200,494 and its costs, $10,484,147, leaving a net profit of $2,716,347. These figures are reviewed in this proceeding in their entirety, and revenues under no other contract are involved, because this renegotiation was conducted on a completed contract basis of accounting.
The trial judge, after an exhaustive analysis, constructed a reasonable profit figure by allowing 10 percent, not on actual costs, but on the estimated costs in the negotiation, thus, $1,152,000, the profit contemplated in the 1963 negotiations. Then he added 5 percent of actual costs, for efficiency, and 2% percent for contribution to the defense effort, making a total non-excessive profit of $1,938,311.
Defendant criticizes this as too generous and would restrict the plaintiff to the 10 percent of costs it said it expected.
We note at the outset of our review that the trial judge characterizes the cost estimates plaintiff used in the 1963 negotiation as "inflated.” This is true in the sense that hindsight shows they were excessive by a large figure. It does not mean they were willfully false or that plaintiff had corrective data that it withheld. Defendant disavows such a contention, and necessarily. The Truth in Negotiations Act, Pub.L. No. 87-653, 76 Stat. 528, 10 U.S.C. § 2306(f), as amended, was applicable to this negotiation. Defendant considered but rejected invoking it, but now would accomplish the result it would have achieved if it had invoked that Act, and established that the entire excess of the estimated over the actual cost was contrary to data in plaintiffs possession. The Renegotiation Act is intended for a different purpose. If plaintiff had achieved a large saving in actual as against estimated costs, in a fixed price negotiated contract, negotiated in good faith before performance began, no one would have doubted that in renegotiation it would have been at least entitled to share in the benefit the saving achieved. We are not convinced that the circumstances dictate a different result here. If defendant had wanted to restrict plaintiff to 10 percent on audited costs, it could have proposed a contract to that end. *253 If the original contract overruns had been left to be settled by change order and equitable adjustment, the same result would have occurred, substantially. In insisting on rolling the whole thing into a fixed price contract, without cost escalation, defendant cannot but have supposed it was protecting itself against possible costs in excess of the estimates. We think that by achieving actual costs below good faith estimates, plaintiff is entitled to credit in renegotiation under the "efficiency” and "reasonableness of cost” factors, even though the estimates in question came late and applied partly to costs actually realized already, though not accurately known.
We conclude, then, using as a "starting point” the expected profit of $1,152,000 — which certainly should stand even though the cost on which it was based was lowered — it would be reasonable to share equally between plaintiff and defendant the benefit inuring from the reduction in costs below the estimates. The trial judge’s determination approximately does this, and therefore it need not depend wholly on his 5 percent and 2% percent allowances, which without corroboration might seem arbitrary to some minds.
We note that the Renegotiation Board’s allowed costs were $10,717,000 and its profit before renegotiation $2,431,000 instead of the trial judge’s determination of $10,484,147 and $2,716,347, respectively. The principal but not the sole reason for these differences is that the Board "as a matter of judgment” allowed $300,000 for overhead expenses in the home offices of the several joint venturers., Apparently it was what is often called in this court a "jury verdict.” It stands to reason that the delays and difficulties, for which defendant was chargeable, must have increased these costs, and the Board made its allowance despite a lack of detailed substantiation. The trial judge disallowed $208,885, allowing only $103,052. See his footnote 1 and findings 132, 133. Finding 132 (i) reads: "The principle of a home office charge is found to be reasonable and fair.” He disallowed as he did for lack of substantiation. However, when it stands to reason a cost has been incurred, but it cannot be substantiated on audit, the proper technique in renegotiation is to consider it under the statutory factor: "Reasonableness of Costs and Profits.” We consider that *254 this item tends to support the trial judge’s determination of a reasonable level of profit while reducing to some extent the dependence on his allowances for efficiency and contribution, of 5 percent and 2% percent. Other revenue inclusion and cost allowance disputes we deem to be inconsequential in face of the broad-brush nature of renegotiation.
Plaintiff urged the trial judge to add to sales and costs the value of government-furnished material (GFM), mostly cable and splice cases. This would have halved or more the profit rate, i.e., the percentage of profit to costs or sales. He refused to do so, a refusal which we support. We note that in several recent cases we have done this. In Camel Manufacturing Co. v. United States, 215 Ct. Cl. 460, 572 F. 2d 280 (1978), we rejected as not binding on us a Board ruling to the contrary. In agreement are Major Coat Co. v. United States, 211 Ct. Cl. 1, 543 F.2d 97 (1976) and Blue Bell, Inc. v. United States, 213 Ct. Cl. 442, 556 F.2d 1118 (1977). However, the circumstances in those cases were different and they are not necessarily binding as precedents here. The change of course does not add to or subtract anything from profits. It diminishes percentage ratios of profits to sales and costs, and therefore may have an influence on minds that rely toó much on such percentages. More legitimately, in many cases it facilitates comparisons to other business of the contractor, or to other companies. A contractor is entitled to profit on GFM, as well as on material he supplies, but not at the same rate. As to GFM, his contribution may, as the trial judge says, be considered one of management, but management also is entitled to some reward.
We think the existence of a large amount of GFM under the contract, excluded from sales and costs, is a matter to be considered under the statutory factor: "Character of business.” Such consideration tends to support the trial judge’s determination of a reasonable level of profit, while reducing to some extent the dependence that has to be placed on his allowances for efficiency and contribution of 5 percent and 2% percent.
It is not, of course, required that favorable consideration under the factors must be cumulated as separate percent *255 age allowances. See Camel Manufacturing Co., supra, 215 Ct. Cl. at 514, 572 F. 2d at 310,
Defendant says that none of the venturers, considered separately, were accustomed to a profit of as much as 10 percent on costs. Assuming this to be true, the record does not disclose the nature of that other business sufficiently for us to weigh the significance of the fact. Each side in oral argument blamed the other for the paucity of the record in that regard. Defendant cannot benefit from this empty comparison; plaintiff does not ask to.
Except for the foregoing, the trial judge sufficiently speaks the opinion of the court.
Chart A, printed herewith, shows in summary form the differences between the Board decision and the trial judge’s decision which we adopt.
CHART A
Page-River-Curran, a Joint Venture Renegotiation, Year ended 12 - 31 - 63
Renegotiation Board Trial Judge
Reneg. Sales (Revenue) $13,148,000 $13,200,494
Renegotiation Profit Percent 2,431,000 18.5% 2,716,347 20.6%
Profit to be Eliminated 1,200,000 778,036
Adj. Sales (Revenue) 11,948,000 12,422,458
Adj. Profit Percent 1,231,000 10.4% 1,938,311 15.6%

Conclusion

Upon the above per curiam opinion of the court, and the trial judge’s opinion and his findings, which have been furnished to the parties, and are adopted by the court, but not printed, the court concludes as a matter of law that plaintiff realized excessive profits in the gross amount of $778,036. The case is remanded to the Trial Division under Rule 131(c) for proceedings to determine what payment, if any, plaintiff has already made, the appropriate credits and adjustments for state and federal taxes, according to law, the allocation of the excessive profits among the *256 venturers for the purpose of determining such credits and adjustments, the interest due according to law, the net amount to be awarded defendant or plaintiff in view of the foregoing, and to recommend the amount of the judgment to be entered for plaintiff or defendant.
Schwartz, Trial Judge:
This is a de novo proceeding under Section 108 of the Renegotiation Act of 1951 brought by plaintiff to determine whether its profits on a single contract with the Air Force were excessive within the meaning of the Act and if so by what amount. 65 Stat. 7, 21 (1951) as amended, 50 U.S.C.App. § 1218 (Supp. V, 1975). The plaintiff, a joint venture, had no other business than the one contract.
The contract called for the installation of the buried intersite cable communication system in one of the six wings of the intercontinental ballistic missile network known as the Minuteman. Gross contract revenue, in this case gross renegotiable income, was $13,200,494, on which plaintiff made a net profit subject to renegotiation of $2,716,347. This profit is 20.6 percent of the contract revenue or sales of $13,200,494 and 25.9 percent of contract costs of $10,484,147.
The conclusion reached here is that the profits were excessive to the extent of $778,036. The recoupment of this sum leaves plaintiff with a profit of $1,938,311, a profit rate of 15.6 percent of gross receipts of $12,422,458 as reduced by the refund of excessive profits and 18.5 percent of costs of $10,484,147.
Minuteman, at the time the country’s most advanced strategic weapon, is composed of missiles placed underground in a gridiron in separate "silos” called launch facilities, interconnected with facilities for launch control. Six wings comprise Minuteman, now called Minuteman 1— four of 150 missiles each and two of 200 missiles each. Plaintiffs wing 2 was a 150-missile wing and consisted of 15 clusters or flights of 10 missiles each, each flight controlled by a launch-control facility. Plaintiff laid slightly over 1500 miles of cable, 30 inches below the ground, in a *257 gridiron covering 10,000 square miles centered on Ell-sworth Air Force Base in Rapid City, South Dakota.
The contract called for delivery of each of the first of the 15 flights on specified dates from November 30, 1962 to July 1, 1963. Time was of the essence. Minuteman, a measure of cold war, was deemed of first priority in the defense of continental United States. Time was of the essence more specifically because performance of cable-laying had to interlock with performance of other contracts, including that of the producer of the missiles. The contract provided for liquidated damages of $1,000 per day per flight for late delivery.
The Government supplied the contractor with the necessary cable and splice cases — the latter are the housings in which the lengths of cable are joined — real estate rights and permits, together with other major materials used, such as pressure component assemblies, load-coils, demi-valves, contactors and conduits. The contractor would survey, prepare the right-of-way, furnish heavy equipment and excavate, lay cable, train splicing personnel and splice the cable, pressurize it by a system of its design, backfill, clean up, test the system and deliver in operational condition the 15 flights of Wing 2 by a series of specified dates.
Plaintiff joint venture is composed of Page Communications Engineers, River Construction Corporation, Curran and Co. and Fischbach & Moore, Inc.; plaintiffs name, PRC, is an acronym for the first named three, the original partners. Page, a subsidiary of Northrop Corporation, provided overall management and technical matters such as pressurization of the system, testing, training and quality control. River, a subsidiary of Morrison-Knudsen Co. Inc., and Curran and Co., both experienced in pipeline construction, undertook the preparation of the right-of-way and the digging and laying of the cable; Fischbach & Moore did the electrical work and cable-splicing.
Plaintiffs bid of $5,476,132 was the lowest of the nine responses to the Request for Proposals, and on analysis by a Source Selection Board of the elements of the proposals, plaintiff led the other bidders. Accordingly, the contract was awarded to plaintiff on December 28,1961, and a letter *258 contract was issued by the Ballistics Systems Division of the Air Force on January 29, 1962.
Surveying work began as scheduled, on January 2, 1962, but delays set in almost immediately by reason of deliveries of insufficient amounts of both cable and splice cases and of defects in what was delivered. The plan was that cable and cases — 1500 miles of cable and 2800 cases— would be produced and delivered on calls by the contractor in specified amounts to a total of material needed for 300 miles of progress per month. The plan broke down at the outset.
The urgency of the whole project was such that the required cable and splice cases were not yet in production — the splice cases were still on the drawing boards— when the contract was awarded to plaintiff and it was scheduled to begin work. Thus while the first cable call was given in January, when plaintiff started trenching, there was no cable for it to lay. Of the first 150 miles of cable called for so as to be due in April 1962, when laying was scheduled to begin, only 10 miles were delivered. An amount sufficient for laying did not arrive until June. When sufficient cable and splice cases did arrive, there were numerous defects requiring "field fixes” or return for repair or replacement.
Some 80 different types of cable were needed for different terrains and function and the various types were called for delivery in the sequence appropriate for use. When deliveries did come, they were out-of-sequence. The results were trenches left open, "spotty” cable-laying, retraced steps and increased costs.
Cable was frequently late and in short supply. For instance, at one point in the course of performance, plaintiff intensified its trenching work on the promise of large production of cable. The promises were not kept, because of an unexpected manufacturing problem, and plaintiff was left with 735 miles of open trench in October 1962, at the beginning of the winter. Open trench meant cost of patrolling and repair as the sides of the trench sloughed in, and the cost of returning to continue the work increased over what would have been the cost had the cable been available at the time the trench was dug.
*259 Production difficulties at the plants of the cable and splice case manufacturers were the prime or exclusive cause of the delays. The products were new — such a system had not been installed before — and there was apparently a goodly number of bugs, both in specifications and production.
The original plan had been that cable-laying, splicing and back-filling would be completed before the winter of 1962-63 set in, with testing and final hook-up to the launch control facilities to take place in the spring and early summer of 1963. No winter work was planned. Under the contract, no work could be done on cable in zero conditions, and winter work would in any event be inefficient. The cumulative effect of the delays caused by late delivery and defects in GFM, however, forced work to go on through the harsh South Dakota winter of 1962-63. Trenches had to be dug in frozen ground. Substantial extra costs were incurred, from the effects of snow and cold.
The Government readily accepted responsibility for the increased costs from the lateness of deliveries of GFM and from its defects, and directed the expansion of work required to meet the needs for completion on schedule or on a revised schedule. Change orders, supplemental agreements and provisional billings and payments at agreed rates per unit of work, to the limit of administratively committed sums beyond the stated contract price, made the original contract a formality.
The original letter contract for $5.5 million was "definitized” in a fixed-price contract at the same price of the original contract. This "definitized” contract was scheduled for March 30, 1962 but the storm of delays and changes was such that it was signed only on September 13, 1962 and made retroactive to April 23, 1962. The "fixed price” stated therein, $5,476,132, was as much a formality as the original price. Funds obligated to the performance of the contract had been increased to $7,050,630, by a fifth amendment to the contract on August 21, 1962, in the month before the signature of the "definitized” contract. And in the month following the "definitized” contract, funds were increased to $8,950,131, by Supplemental Agreement No. 2 of November 30, 1962.
*260 Unable to distinguish the source of costs as the original contract work, the change orders or expanded operations undertaken at Government behest to meet slippage in program, the Air Force decided to reprice the entire contract. Early in 1963, therefore, plaintiff on request submitted a total-price proposal, soon updated to $16,524,000, of which $9.2 million was an estimate of costs to completion.
Negotiations for the repricing took place in late April 1963 when funds committed to the contract and the provisional billing total for progress payments already amounted to over $10 million. After 5 days of negotiations, on May 2, the parties agreed on the round sum of $13,000,000. Their agreement was embodied in a Supplemental Agreement No. 8 effective May 2, 1963, of which more later. The agreed price of $13 million was thereafter increased by minor change orders to $13,148,613, which became the final contract price. Additional contract-related income of $51,881 brought total renegotiable income to $13,200,494, the sum first mentioned above.
Supplemental Agreement No. 8 again, as had an earlier agreement, recited the Government’s recognition that it was responsible for its failure to furnish GFM in time and in a condition suitable for intended use, for the resulting delays and the expansion of plaintiffs work to minimize the delays, and for the consequent increases in cost and in the time needed for performance of the contract. The original delivery dates of the 15 flights were changed from November 30,1962 — July 1, 1963 to May 15,1963 — October 1, 1963.
Lest the size of the increase in contract price from first award to final pricing be thought unusual, it is added that comparable increases characterized, also, the contracts for the cable systems in the other five wings of the Minuteman project. The award and final contract prices for the six wings were as follows:
*261 Final Wing Award price Contract Price Increase %
1 $8,642,000 $12,740,000 4,098,000 47
2 5,746,132 13,147,863 7,401,731 128.81
3 4,740,598 7,000,000 2,259,402 48
4 6,225,000 14,196,194 7,971,194 128
5 6,434,234 7,366,647 932,413 14
6 2,992,736 6,328,293 3,335,557 111.46
With the foregoing preliminary review of the contract, the several statutory factors stated in section 103(e) of the Renegotiation Act, 50 U.S.C.App. § 1213(e), as bearing on excessiveness will be considered.
The Character of the Business. "Character of business, including source and nature of materials, complexity of manufacturing technique, character and extent of subcontracting, and rate of turnover.” Renegotiation Act § 103(e)(5), supra; Regulations, 32 C.F.R. § 1460.14 (1973).
The "manufacturing technique” employed in performance was not a single one for the entire job. About 70 percent of the job, consisting of relatively non-complex cable-laying, that is, surveying, trenching, laying, backfilling, compacting and right-of-way work, was construction work done by experienced pipelayers. Cable was laid in large part under winter conditions, at scattered locations, under conditions frequently disorganized by the late deliveries of cable and splice cases and the defects in the goods delivered. The other large part of the work— about 30 percent — was cable splicing, pressurization and testing, all relatively complex work performed by skilled electricians. The splicing responsibility entailed the establishment by plaintiff of a school for the training of its own splicers as well as the Government’s quality examiners. The basic design of the system was done by the Air Force. A limited amount of engineering design was required of plaintiff for the pressure system, which included an automatic alarm feature supplied by the contractor.
*262 Efficiency. "In determining excessive profits favorable recognition must be given to the efficiency of the contractor or subcontractor, with particular regard to the attainment of quantity and quality production, reduction of costs, and economy in the use of materials, facilities, and manpower.” Section 103(e) Renegotiation Act; see also Regulations § 1460.9(a). There is no doubt that plaintiff did an excellent job, exercising superior skill and exhibiting high technical proficiency, under conditions of very substantial difficulty. The several elements of efficiency will be separately discussed.
Quality, Quantity and Volume. In this case quality, quantity, scheduled timeliness and volume, ordinarily separate elements of efficiency, all merge into the delivery by plaintiff on time of a working system. Completed flights were delivered beginning May 16, 1963 and ending September 6, 1963. The first flight was delivered only 1 day late and the successive flights were each delivered on time or from 2 to 27 days earlier than schedule. The final flight was delivered 25 days earlier than the required delivery date of October 1, 1963.
The system was operational; it did what it was supposed to do and no more could be asked. Since time was particularly of the essence of the contract, delivery on and before schedule was especially commendable.
Labor. Labor was in short supply; similar jobs were going on in the same or nearby areas. Plaintiff very effectively recruited and trained its labor. There were no labor stoppages. When work was interrupted by deliveries of GFM either late or in unsuitable condition, plaintiff sensibly kept its men on rather than letting them go, rehiring and retraining them.
Economy and reduction of costs. Profits were high and might ordinarily indicate economy and a reduction in costs by an efficient fixed-price contractor. A major dispute in the case, discussed below, is over whether the surplus of estimated over actual costs is to be attributed to plaintiffs economical use of facilities and manpower with resulting reduction of costs or to an overestimation of costs, overpricing and an overbearing treatment by plaintiff of *263 the Government in the price negotiations in which the contract was repriced from $5.5 to $13 million.
A saving was realized by the termination of a subcontract for seeding and mulching the right-of-way, and the performance of the work by the plaintiffs own forces. The subcontract would have cost $160,000; plaintiffs costs were $100,000 — a saving of $60,000.
Plaintiff was economical in the use of the Government’s materials. It made field fixes of damaged materials, suggested economical repairs and utilized scrap cable where possible. Thrifty suggestions included a method of sealing cable ends while the cable was on reels, thereby enabling testing of pressure integrity in advance of laying; and a method of attaching the cable to reels which prevented damage to cable during shipping. When a grommet used in a particular size of splicing case did not provide a tight fit against gas pressure, the project manager, Mr. Bailey, suggested the use of uncured isobutyl rubber for the purpose. He had had experience with such use of uncured rubber in his extensive earlier work in laying cable.
Work Under Difficult Conditions. The work was done, as already indicated, under extraordinarily difficult conditions. The project was a matter of urgent defense, the materials were delivered late and were often defective; production schedules were consequently disorganized and abandoned, and work had to be extended over the winter.
The difficulties caused by the late deliveries, however, can be exaggerated. Particularly misleading are comparisons between contract contemplated deliveries of cable and splice cases and the "average” actually delivered, and the number of months accumulated of delay, according to the schedule, in the late stages of performance. There were substantially no deliveries in the early months of the schedule. The schedule was found impossible to keep and the costs resulting from the delays were borne by the Government, from the first time they appeared. In essence, the contemplated schedule was agreed to be ineffective.
But great difficulties there were — difficulties which changed a big but straightforward cable-laying job into a complex task of management and coordination requiring *264 greatly increased expenditures, borne by the Government, and management talents of high order, which plaintiff was able to and did supply.
Management. The project was fortunate in the assignment of Mr. Loren A. Bailey as chief of the project. Mr. Bailey, a man of much experience in cable-laying, successfully coped with the unusual management difficulties. At the conclusion of the contract Mr. Bailey and his management staff were commended by the Air Force for their outstanding management of the project, described as a "job well done.”
Suggestions and Improvements. Mr. Bailey in consultation with the cable and splice case manufacturers and Air Force representatives and in some cases alone, was the source of numbers of suggestions for improvement and repair of elements of the system. His experience particularly enabled him to help with repairs and field "fixes” for damaged cable and methods for improving equipment in the light of actual operating conditions.
At one point Mr. Bailey suggested a change in the design of the largest type of splice case to be manufactured, of which 850 were to be manufactured at a cost of $1750. Plaintiff would have it that without Mr. Bailey’s suggestion the case would have been a total loss and that his suggestion made the case workable, and that the suggestion thus saved the Government 850 times $1750. This is too much for credibility. The testimony was somewhat self-serving; also, it may be doubted whether the suggestion makes the case workable or rather only improved it and whether a complete run of 850 of totally useless cases would have resulted from the failure to make the suggestion.
In another instance plaintiff suggested the repair of slashed cable by the application of tape over the cut. This is said to have saved the cost of the two splice cases had the damaged piece been cut out and a new length spliced in. But the suggestion seems rather obvious. Suggestions for even more complex repairs to avoid expensive and wasteful replacements are to be expected as a matter of course from a competent and experienced contractor.
*265 Again, when the load coils turned out to be too big to fit in the splice cases, as the specifications had provided, and they were put outside the case and attached to it by stub cable, plaintiff used surplus short ends of cable which would otherwise have been discarded. The use of such cable as against newly-manufactured cable of course saved the cost of new cable. Again, no less should have been expected of a competent contractor. Still another such episode is plaintiffs improvement by way of a "modification” of a tool used to apply the connector clamp which spliced the wires of two lengths of cable.
Plaintiffs claims to sole credit for many suggestions and for savings in the "millions” from its suggestions were pardonably exaggerated by its witnesses. The Air Force report to the Renegotiation Board answered "None” to a question as to "innovations of contractor that would have reduced costs.” Savings no doubt accrued to the Government from Mr. Bailey’s useful suggestions and helpful discussions with others involved in the project but there is little basis for the conclusory testimony that many millions were saved, or for the claims of fundamentally important changes, indispensable for the working of the system, emanating from plaintiff working alone.
The savings, though doubtless real, were, for one thing, on the record not quantified and quite likely not quantifiable. See Butkin Precision Mfg. Corp. v. United States, 211 Ct. Cl. 110, 130-31, 544 F.2d 499, 510-11 (1976). For another, plaintiffs design suggestions were usually in consultation with Air Force and GFM manufacturer representatives. The suggestions for economy and simplicity were of the kind to be expected from a competent contractor. Plaintiffs suggestions were, however, valuable and contribute to the high consideration to which plaintiff is entitled for its efficiency.
Contribution to the Defense Effort, the Public Interest and Fair and Equitable Dealing: "Nature and extent of contribution to the defense effort, including inventive and developmental contribution and cooperation with the Government and other contractors in supplying technical assistance;” * * * "Such other factors the consideration of which the public interest and fair and equitable dealing *266 may require * * *” Renegotiation Act, § 103(e)(4) and (6); Regulations, supra, §§ 1460.13, 1460.15.
Asked by the Renegotiation Board to appraise the plaintiffs contribution to the defense effort, "with particular emphasis on work done by him in development of new materiel, invention of new devices, management of large weapons systems contracts as prime or associate contractor, effective use of value engineering, and the like” the Air Force responded "NA-[not applicable] No R&D effort or Value Engineering. Basically a production type effort.”
Here, too, the plaintiffs claims aré exaggerated. The claim of unique achievement in providing an unprecedented state-of-the-art communications system is somewhat blunted by the fact that the contractors for the cable communication systems for the other wings also furnished a working system on time, and that none of them seems to have done less than a good job. All were operational; none developed unusual or unexpected maintenance problems. No credit is given to the fragmentary opinion evidence suggesting that plaintiffs wing was the best of all, or that some others were poorly installed.
Somewhat exaggerated, too, is the claim to credit for having exceeded contract requirements, by virtue of having provided a system with 8 pounds of pressure instead of the 7 pounds called for by the specifications. The specifications required 7 pounds of pressure, which should not drop more than 2 pounds. Compliance would have required setting contactors — pressure indicators — individually at a multitude of points. Trenches would have had to be reopened or left open for this purpose. To avoid this, plaintiff proposed providing an 8 pound system, with all contactors pre-set at 6 pounds. The suggestion was adopted. The change seems to have been a useful, economical step primarily profitable for plaintiff but also of value to the system furnished. Plaintiff was entirely cooperative with the Government and other related contractors. Mr. Loren Bailey personally worked with Air Force representatives, Anaconda, the cable supplier and Channell, the splice case supplier, to solve design, manufacturing and delivery problems. Plaintiff was, as already noted, the source of or a contributor to numerous suggestions in the course of the work designed to *267 overcome difficulties and solve the problems created by the defects which appeared in the Government-furnished material. While these are recognized under the factor of efficiency, their cumulative effect calls for recognition under the contribution factor as well.
Upon completion of the contract plaintiff turned over to the Government the data it had accumulated on defects in splice cases and other technical documentation, valuable for purposes of the maintenance of the system, and was commended for doing so. This, too, adds to the favorable consideration of the plaintiff under the contribution factor.
Finally, plaintiff is entitled to favorable consideration under the factor of contribution to the defense effort for having merged the resources of four partners in order to respond to the need for a large-scale cable-laying effort for military and essentially wartime purposes. Production for war demands the marshalling of resources and efforts beyond the ordinary civilian capacity, together commanding the variety of abilities needed. The grouping of four companies into one joint venture, to bid successfully on the project, was an affirmative contribution to national defense. A.C. Ball Co. v. United States, 209 Ct. Cl. 223, 254, 531 F.2d 993, 1010 (1976).
The factors of the "public interest” and "fair and equitable dealing,” found in section 103(e)(6), supra, in this case require no separate comment. The two factors are the heart of the Renegotiation Act. Excessive profits are to be returned, consistently with fair and equitable dealing for the contractor, all in the promotion of the defense effort and the public interest.
Net Worth. "The net worth, with particular regard to the amount and source of public and private capital employed.” Renegotiation Act, § 103(e)(2); Regulations, supra, § 1460.11.
Plaintiff invested less than $750,000 of capital and the Government financed the contract with contributions of GFM whose cost was over $16 million and with progress payments for units of work at defined dollar rates, from ample funds committed to the project.
By May 1963, the time of the repricing of the contract at $13 million, plaintiff had already deposited contract funds *268 of $7.1 million, had received approval of progress payments of $8.8 million and had a claim, for work done, for $11.1 million, all to be compared with its total costs at completion, 6 months later of $10.5 million.
Plaintiffs contract was essentially one for construction services and not one involving capital investment. Accordingly, neither party argues for any materiality to the rate of reasonable profit of any standard of return on net worth or invested capital. In the circumstances the use of invested capital and of a return on invested capital as a starting point for the judgment on the reasonableness of plaintiffs profits would be inappropriate and even misleading. Mason & Hanger-Silas Mason Co. v. United States, 207 Ct. Cl. 106, 137, 518 F.2d 1341, 1359 (1975); A.C. Ball Co. v. United States, supra, 209 Ct. Cl. at 255, 531 F.2d at 1010-11 ; Butkin Precision Mfg. Corp. v. United States, supra, 211 Ct. Cl. at 123-24, 544 F.2d at 507-08
Extent of Risk Assumed. "Extent of risk assumed, including the risk incident to reasonable pricing policies.” Renegotiation Act § 103(e)(3); Regulations, supra, § 1460.14.
The parties are in dispute over the degree of risk of loss borne by plaintiff for the $16.2 million worth of GFM. Plaintiff was not required to carry insurance and the contract clause on the subject of responsibility limited plaintiffs risk to losses by the wilful misconduct or lack of good faith of its managers. No added risk can therefore be found in any responsibility of the plaintiff for the GFM.
Plaintiff sacrificed no civilian markets, made no price reductions or refunds. Its liabilities on the contract warranty against installation defects and for off-right-of-way claims are not risks of the kind contemplated by § 103(e)(3) of the Act, but rather contractual burdens, incident to the promised performance, for which full pay is made in the form of contract price.
The several comments relating to risk and pricing in the Air Force report to the Renegotiation Board are these (with the questions asked indicated in parentheses):
(C) (unusual risks-close pricing, cost increases, shortages of material, guarantees) No unusual risk. Risk was very limited due to majority of material required being GFP Changed Conditions Clause *269 protected Contractor from latent subsurface conditions. Delays in GFP were basis for change in Contract price and schedule.
* * * * *
(G) Based on experience at subsequent wings it would appear that PAGE-RIVER-CURRAN was a high cost producer. However, due to nature of the work, time period, etc., it is difficult to make a factual determination as to whether or not contractor is a high, average, or low cost producer.
(H) Reasonableness of proposals is questionable and on the high side. However, this is considered normal for the industry. Contractor’s cost proposal of $16,524,000 was negotiated at $13,000,000, a 22% variance between requested and acceptable settlement.
(I) (comparison of prices with competitors’ prices for similar products) Wing III -1500 miles, same effort with similar delays in receipt of GF cable and splice cases. Total cost expected to be slightly under $7,000,000.00. Wing V - 2200 miles, no delays in GFP. Estimated cost thru completion $8,500,000.00.
The official Air Force opinion, albeit presented in a written report by an officer not subject to cross-examination, is thus that risk was "very limited”; that though a "factual determination” is "difficult,” on the experience with subsequent wings, plaintiff was a high cost producer.
On a comparison made between the cost per mile of plaintiffs and other contractor’s installations, it appears that the cost per mile of the cable installations in the six wings of the Minuteman was as follows:
*270 Wing Final Contract Price Mileage Cost Per Mile
rH $12,740,000 LO CO $7218
oq 13,147,863 00 tH t-H $8661
CO 7,000,000* 1C CO t-H $4560
^ 14,196,194 I> t> t-H $7989
ic 7,366,647 CO CO 03 $3370
CO 6,328,293 tH rH $6235
The $8661 cost per mile of cable installation in plaintiffs wing was the highest of all — almost twice as much as the $4560 cost per mile in Wing 3. If the quoted Air Force statement — that Wing 3 conditions ' and effort required were comparable to those in Wing 2 — is taken as fact, then plaintiff was a very high cost producer indeed. There is however square conflict of opinion on the comparability of Wings 3 and 2. Another opinion in the record is that Wing 3 received cable closer to its contract schedule than did Wing 2. Whatever the resolution of this question, it does seem that plaintiff was on the high side, or at the least sufficiently high to deprive it of any credit for low or close pricing.
Plaintiff emphasizes that the contractor undertaking a firm fixed-price contract to perform for the first time such an unprecedented contract as this one is subject to well-known risks. A.C. Ball Co. v. United States, supra, 209 Ct. Cl. at 248-49, 251, 531 F.2d at 1007-08 ; Aero Spacelines Inc. v. United States, 208 Ct. Cl. 704, 739-45, 530 F.2d 324, 346-49 (1976). While there was here little risk of rising costs of materials — almost all of the material used was Government-supplied — the project was unprecedented and the importance of completion on schedule accentuated the risk of late or disorganized delivery of the materials to be supplied, without an assumption of responsibility by the Government. Plaintiff was subject to a liquidated damages clause providing for $1,000 in damages per day of late delivery per flight. Had program calculations somehow gone awry, without an assumption of responsibility by the Government, damages would have been substantial.
*271 If the contract had continued as originally let, and had been performed as a contract for $5.5 million, plaintiff would be entitled to all the consideration, under the factor of risk, given the firm, fixed-price contractor. But the contract did not continue as such a contract, but was repriced at a much higher sum, when the risks were much less and much more foreseeable, than originally.
The final price in each of the contracts for cable installation in the several wings of the Minuteman project was in each case much higher than the original price. Quite obviously the original prices were more or less tentative. The renegotiation of the contract in S.A. No. 8 was based upon a proposal by plaintiff for a price of $16 million. The proposal was made up of two parts, costs to date and projected costs to completion. In computing projected costs, plaintiff had the benefit of cost experience in performance to then date, of deliveries of a large proportion of total GFM, and of estimates of costs to conclusion which are now seen to have been most generous.
The $13 million price set by S.A. No. 8 was in a sense a final restatement of what had been clear from early on— that the contract was more a cost contract than a fixed-price contract. And to the extent it was a cost contract, then the plaintiff is not entitled to the favorable consideration under the factor of risk which is the right of the fixed-price contractor.
Nor can it be said that the contract was competitively bid and awarded in the sense that commands favorable consideration under the factor of risk. The authority invoked for negotiation was the leave granted in 10 U.S.C. § 2304(a)(10) to negotiate where "it is impracticable to obtain competition.” True, nine proposals were received ranging from plaintiffs $5.5 million to $11 million. And it is true that the choice of plaintiff over the other eight firms submitting proposals was made by a Source Selection Board, on consideration of price, management, skills and technical proficiency. But the Government had no such freedom of choice when in April 1963, with the job well on its way to completion, plaintiff "proposed” that it be paid $16 million for the job. The Air Force could of course not go elsewhere; the only choices were an agreed sum or the *272 provocation of disorderly litigation, with a risk to the military objective of the project. The contract was in this sense a sole-source procurement, with little or no competitive content, and reasonable profits must be judged accordingly.
Reasonableness of Costs and Profits: "Reasonableness of costs and profits, with particular regard to volume of production, normal earnings, and comparison of war and peacetime products.” Renegotiation Act § 103(e)(1); Regulations, § 1460(10).
1. Costs and Profits. On the resolution of minor controversies over items of costs and contract income,[1] it appears that plaintiffs renegotiable income and profits were these:
Gross receipts subject to renegotiation $13,200,494
Direct Cost of Sales 8,149,167
G&A Costs 2,334,980
Total Costs (10,484,147)
Net Profit $2,716,347
*273 As already noted, these net profits produce a profit rate of 20.6 percent expressed as a percentage of gross receipts, and 25.9 percent expressed as a percentage of costs.
2. The Value of GFM. Renegotiable sales, plaintiff urges, should be increased for purposes of the inquiry into the reasonableness of its profits by the addition of the costs of the Government-furnished material — the $14 million paid by the Government to Anaconda for cable and the $2.2 million paid for splice cases. Were this to be done, gross receipts would be more than doubled and the profit rate would be halved, at least.
For cable and cases to be treated as part of sales, account would have to be taken of the nature of the costs of these materials as capital. The Regulations of the Renegotiation Board twice indicate the profit consequence for a contractor who "uses” customer-furnished materials. In elaborating the factor of "character of business” the Regulations state that such a contractor "generally is not entitled to as large a dollar profit as the dollar profit to which such contractor would have been entitled had it furnished the materials itself.” § 1460.14(b)(2). And in connection with "capital employed” the Regulations speak of more favorable consideration for the contractor who is not dependent on Government financing than for the contractor who is so dependent, and also state that "[w]hen a large part of the capital employed is supplied by the Government or by customers, the contractor’s contribution tends to become one of management only and the profit will be considered accordingly.” Regulations § 1460.11(b)(4). In plainer words, the contractor is not to make a return on capital contributed by the Government. Mason & Hanger-Silas Mason Co. v. United States, supra.
As an original proposition, moreover, there seems little reason to judge the reasonableness of the profits of a cable-laying concern on the basis of gross receipts which include both the value of the contractor’s services and of the cable furnished by the owner. Cable-laying is one thing; cable manufacture and supply another. The cable-layer or pipeline builder ordinarily does not and in this case did not supply cable. Plaintiff supplied a service — it laid the Government’s cable; it did not sell cable to the Govern *274 ment. If the plaintiff had a substantial financial risk on a loss of the cable and cases while they were in its possession, a cost for insurance would be incurred. Or if the contractor is made a bailee of GFM and subjected to the burdens of' ownership a case may be made for treating values of GFM as part of sales. Major Coat Co. v. United States, 211 Ct. Cl. 1, 16-20, 543 F.2d 97, 106-08 (1976), reh. denied, 211 Ct. Cl. 49, 549 F.2d 196. But plaintiff was not required to carry insurance and as noted above under the factor of risk was exempted in practice from risk of loss of GFM.
The Government bought the cable from a cable manufacturer and paid the seller a profit. There seems no reason the Government should pay a second profit on the same cable, beyond, of course, a proper profit on the costs of handling and laying. The warehouseman is not paid a profit as if on a sale of the goods bailed; the goldsmith does not get a profit on the gem he sets; a cook is paid wages, not, at least in honest households, a profit on the meat and groceries which the householder buys and causes delivered to the kitchen door. Plaintiff sold services — cable-laying services — not cable and is not entitled to a profit as if on a sale of cable.
3. "Weighted Guidelines” as a Measure of Reasonableness of Profits. Mr. James E. Cravens testified as an expert witness for the Government on what would be a reasonable profit in this cáse, determined by the use of the weighted guidelines method of analysis. ASPR 3-808.1, 3-808.2, 32 C.F.R. §§ 3.808-1, 3.808-2 (1973). Mr. Cravens has written and lectured widely and voluminously on the subject of weighted guidelines, and he is an active practitioner of the method. He has applied weighted guidelines a dozen times since 1969, in one instance to a billion-dollar lunar landing contract.
Mr. Cravens testified that the weighted guidelines method of analysis is a discipline for insuring that every element of costs is considered in determining profit; that it was developed for the primary purpose of attracting more competent contractors by increasing, for deserving contractors, their profit possibilities.
Under the method, he testified, different profit limits are established for the various elements of cost. Following *275 consideration of the appropriate profit for the separate elements of cost, adjustments up or down are made based on total cost, on consideration of (1) risk due to type of contract, (2) performance, (3) source of resources, (4) special achievement, (5) other selected factors, (6) special factor for development with private funds, and (7) special factor for development of foreign sales.
The major use of the weighted guidelines method, the witness testified, is to establish a going-in profit objective for the Government’s contract negotiator to use in negotiating a contract price; that while the guidelines may be used in a retroactive manner during negotiations to "definitize” a letter contract, they have nothing to do with "going out” profits or with the contract after performance has been completed. He agreed that the weighted guidelines system recognizes that there may be wide variances between profit objectives and realized profits.
Mr. Cravens testified that in his opinion a reasonable profit in the contract in suit would be $1,141,758 based on a total project cost of $10,330,000, a sum very close to the actual costs of $10,485,147 found herein.
He testified in detail as to how his decisions were reached as to each element of profit he allowed. In reaching his conclusions, he said, he considered all the statutory factors of the Renegotiation Act, which he felt were similar to the factors in the weighted guidelines system, except the guidelines for the application of judgment in "your closed rooms,” by which he apparently meant the judicial determinations under the Renegotiation Act of reasonable, non-excessive profit.
Putting aside technical objections to the hypothetical question by which his opinion was elicited, and the ambiguities created by his efforts to avoid trespassing on the judicial function, Mr. Cravens’ testimony is held not persuasive on the issue on which it is offered. It is little more than the witness — or perhaps any Government-trained user of the method — would give on a prospective analysis of the profit to be allowed, were the contract being negotiated today. The product of the guidelines by a Government witness cannot be allowed to become both the prospective and retrospective profit in negotiated contracts, *276 else the Renegotiation Act and its factors would be preempted and no allowance would be made for the evidence of the performance of the contract. Compare the rejection of the same witness’ testimony on the same issue — reasonable profit — in Aero Spacelines Inc. v. United States, 208 Ct. Cl. 704, 712, 759-75, 530 F.2d 324, 330, 357-67 (1976). His conclusion, that on the basis of total project costs of $10,330,000, a profit of $1,141,758 or 11 percent of costs would be reasonable — is substantially identical to the profit of $1,152,000 which as will appear below the Air Force considered reasonable in the repricing negotiations in 1963.
4. Section 103(e)(1): "volume of production, normal earnings, and comparison of war and peacetime products.” The concept of "volume of production” in the usual sense is not applicable in the present case, except to the extent that volume means completion in time or before, already mentioned in connection with efficiency.
These are the income figures and percentage profit rates of the several partners, to the extent they were introduced into evidence by the Government for their relevance to "normal earnings, and comparison of war and peacetime products”:
FY 1960 FY 1961 FY 1963 FY 1964 FY 1965
Page $410,000 2.4% $1.7 million 5.5% $2.2 million 7.1%
River $451,000 10.6% $16,239 .4% $26,643 .5%
Curran $249,000 13.9% Sales $3 million
Loss $500,000
The profits of three of the partners did not approach the level of the profits of the joint venture. That is hardly enough for the determination required. There is no evidence as to the nature of the work done — whether prosaic and repetitive or new and risky, large-scale or not, fixed-price or cost-plus, done efficiently or indifferently. The absolute amounts involved are very small. Moreover, *277 the individual partners’ profits are of course not the profits of the partnership under review, a wholly different entity.
Nevertheless, the data tells us something: that the profits of three of the four partners in their respective fields fluctuated widely and on the average were far below the profits earned by the joint venture, and even below the 10 percent which, it will appear, was the estimated profit at the time of the original award in 1961 and the repricing in 1963.
5. Comparisons with industry averages. The costs and profits of the five contractors who laid the cable for the other wings of the Minuteman project would of course be highly relevant for comparative purposes, especially, or perhaps only, if coupled with a judgment as to their respective efficiency. The decisions which have emphasized such data, Major Coat Co. v. United States, supra, and Butkin Precision Mfg. Corp. v. United States, supra, came down, of course, after the trial of the instant case. For this case it is enough that the data is not in the record and that there is no point in speculating as to the reasons for the absence of the data. The burden of producing such data to show excessiveness of plaintiffs profits was of course on the Government. The absence of the data simply leaves the Government to meet its burden, if it can, with other proof.
There are in the record a few scattered judgments on the efficiency of the several contractors. Project or procurement officers ventured conclusory opinions that the installation in one or another wing other than plaintiffs was slipshod or poor and that still another was inefficient in the use of manpower and money. These opinions are not credited as a reliable basis for any conclusion on the relative or absolute efficiency of the cable systems in the several other wings. And in any event the profit and profit rate, if any, of the other contractors does not appear.[2]
The Government introduced, as comparable industry profits, the IRS statistical compilations of average dollar sales and profits of the companies of comparable size in the *278 industry categories appearing on the income tax returns of the partners.
Page in its returns for the year ended July 1963 classified itself in industry code 739, "Business services, credit reporting agencies, duplicating, mailing and stenographic services, building services, news syndicates, employment agencies and other business services” and for the year ended July 1964 in Code 7398, "Business services, services to dwellings and other buildings.” The IRS statistics for comparable periods show that comparably-sized companies in these two industry groups performed as follows (6 zeros omitted, in all the following IRS dollar figures):
[[Image here]]
This data is patently irrelevant. Though the choices available may have reasonably suggested to Page that it fitted better into Industry Codes 739 and 7398 than any others, credit, mailing and employment services are worlds apart from both Page’s work as manager of the joint venture and the work of the joint venture as a whole.
River in its returns for 1963 and 1964 classified itself in IRS industry code 1538, "Contract construction, special trade contractors not elsewhere classified.” The IRS statistics for comparable periods show that comparably sized companies in these industries performed as follows:
[[Image here]]
"Special Trade contractors” was Curran’s choice, too, m one relevant year. In its return for the year ended August 1963, Curran classified itself in industry code 155, "Special *279 Trade Contractors,” adding to the code number the words "pipeline contractors.” In its return for the year ended August 1965 Curran classified itself in Code 1520, "Contract Construction, general contractors, heavy construction.” The IRS statistics for somewhat comparable periods show that comparably sized companies in these industries performed as follows:
[[Image here]]
' Special trade contractors,” appearing on both River’s and Curran’s returns, is uninformative, saying only that it is a miscellany. We do not know whether and how many pipeline or cable-laying contractors are included. Curran’s choice of "Contract Construction, general contractors, heavy construction” is closer to the mark, for a large part of the work of the plaintiff may reasonably be likened to heavy construction. It thus appears that in 1964 and 1965 general contractors with assets comparable to Curran’s engaged in those years in heavy construction made profits of about 4% percent on total receipts. A major defect in this data is, of course, that it does not tell how much profit was made by the superior, highly efficient contractor engaged in heavy construction. Despite the sparsity of the data, the need is, as has been said, great and requires that less directly relevant data be used for what it is worth, if only to fix the lower levels of what is reasonable compensation. Major Coat Co. v. United States, supra, 211 Ct. Cl. at 45-48, 543 F.2d at 122-24; Butkin Precision Mfg. Corp. v. United States, supra, 211 Ct. Cl. at 118-19, 544 F.2d at 504.
6. Contemplated rates of profit. The repeated use in the original bid and thereafter of a rate of 10 percent for estimated profit is said by the Government to prove that 10 percent is a reasonable rate of profit, by plaintiffs own expectation.
*280 Plaintiff in its bid computations included profit at 10 percent of costs and four of the unsuccessful bidders estimated a profit of less than 10 percent of costs. Shortly before the negotiation of Supplemental Agreement No. 8 of May 2, 1963, plaintiff in the course of a request that the Air Force commit an additional $2,500,000 to the contract, to permit payment of contract-obligated performance through June 1963, stated that its price for work through March 30 was $9,570,000, made up of costs of $8,700,000 and "minimum profit” of $870,000.
The expectation of only a 10 percent profit was confirmed in the negotiations between plaintiff and the Air Force, in April and May of 1963, for what became Supplemental Agreement No. 8 of May 2, 1963. These negotiations, as already noted, were the product of the inability of the Air Force to price the changes, delays and expansions of work brought about by the collapse of the schedule for delivery of GFM. Finding itself unable to distinguish between originally contracted-for work and new work, the Air Force decided to reprice the whole contract. Accordingly, request was made that the plaintiff submit a statement of its incurred costs to March 1963, and an estimate of runout costs or costs to completion. The plaintiffs response was a proposal of a total price for the project of $16,524,000, composed of $7,308,445, on account of costs to March 1963, and $9,215,555, an estimate of further costs to completion. The proposed $16 million was then bargained by the Air Force down to the $13 million, in negotiations beginning on April 27, 1963.
Negotiations took place on a total-cost basis, despite Air Force efforts to focus on individual items. After 5 days of such bargaining, plaintiff had lowered its offer to a take-it- or-leave-it $13,250,000 and the Air Force had counterof-fered $12,875,000. At that point, on May 2, 1963, the principal representatives of both sides met and agreed on $13 million.
It has also been said, above, in the discussion of the factor of risk, that the context of these negotiations was so lacking in competitive character as requires that the contract as repriced be treated as essentially a sole source *281 procurement. It was moreover a sole source procurement to satisfy a defense need of a most urgent nature.
There is a good deal of support for the proposition advanced by the Government that plaintiff, apparently appreciative of its commanding position, acted in an overbearing manner and withheld price information, and that at least its proposed price was overstated. Plaintiffs willingness to take $13 million when it first asked for $16.5 million is substantial evidence of overpricing in the proposed price, even aside from the large profit realized on the final accounting. The reports of the Air Force’s pre-negotiation analyses of the proposed price more than suggest overpricing. The Air Force Base Auditor who examined the incurred-cost portion of plaintiffs proposal, Major R.W. Fletcher, questioned $740,361 of the $6,022,896 total of incurred costs (in the early, first proposal as it then stood), noted that his report did not indicate acceptance of the costs not questioned, and reported difficulties in making his audit, among them inadequate supporting documentation, unavailability of income statements, balance sheets and data on the cost or rental of the equipment which was obtained from the individual venturers.
The analysts who were assigned to audit the runout costs part of the proposal reported that their approach was hampered and their analysis had to be modified by plaintiffs refusal to furnish information on (1) lease and rental agreements, (2) incentive agreement, (3) home office service charge or billings, (4) demobilization projection, (5) incurred labor hours by category for the plaintiffs 43 construction categories and 21 splicing categories, and (6) phase-in and out of equipment and usage. In consequence of these refusals, the auditors were required to limit themselves to an analysis of projected costs on the basis of incurred costs, to the extent they were furnished. They could not, moreover, determine how much future costs of splicing — the bulk of the work remaining to be done — were minimized by past experience. They made specific mention of the refusal by plaintiff to furnish information by which they could learn the extent of the contract learning in the area of splicing.
*282 Their report condemned all the contractor’s figures as "way out of line,” saying that:
The entire contractor proposal is way out of line when compared to his actuals. Overall it is felt that the contractor did not even attempt to use his incurred costs in his projection. In addition, the contractor refused to give information requested by the Price Analyst. This indicates that he is trying to maintain his own projection for negotiation purposes. Contractor at best is considered uncooperative.
The report of these analysts recommended (at a point when the proposal stood at $15,160,406) a price of $11,685,781 to include $10,346,610 for actual costs, $1,034,661 for profit at 10 percent and $304,510 for estimated property and off-right-of-way claims.
There is in the record a detailed Air Force memorandum, dated May 16,1963 on the fiscal aspects of the negotiations, giving the elements of contract costs, the amount of the item proposed by the contractor, the amount which was the Air Force’s objective and the amount considered negotiated. The memorandum shows that profit was estimated at $1,152,000, approximately 10 percent of estimated costs of $11,517,000 (excluding costs of off-right-of-way claims and freight), and 9 percent of total costs of $11,848,000:
*283 [[Image here]]
There was one attempted departure from conformity to a 10 percent limit on estimated profits. In its first proposals, plaintiff had tried to raise its estimated profit from 10 to 15 percent, or at least to add to the 10 percent for profit another 5 percent of a certain sum whose source is not clear. In the estimates purporting to justify the asking price there appears both (1) an item of $1,449,000 for profit on estimated costs of $14,489,000, called profit at 10 percent, and (2) an item described as "earned efficiency (5% of $4,900,000) $245,000.” This latter item was raised from $245,000 to $265,000 in the final proposal of $16,524,000. The source of the sum of $4,900,000 is not clear, but it is clear that the Air Force negotiators would have none of such an increase over 10 percent in estimated profit.
*284 A 10 percent profit on the original contract was reasonable, in the opinion of no less a party in interest than plaintiffs project manager, who was in charge of the original response to the RFP and who led the negotiations for the repricing at $13 million. A finding of fact proposed by plaintiff is that Mr. Bailey expressed the opinion based on his extensive experience and his review of the Government’s original RFP that had the Government-furnished material been delivered on schedule the price proposed by plaintiff would cover costs and allow a reasonable profit.
The repeated references by plaintiff to estimated profit of 10 percent, while not at all an agreement or a ceiling on profits, were much more than the mere "seller’s talk.” Here the expectation of a 10 percent profit limit was repeatedly expressed in the original bidding and in requests for progress payments and additional commitments of funds, enroute to S.A. No. 8. Cf. Gibraltar Mfg. Co. v. United States, 212 Ct. Cl. 226, 229-30, 240-41, 546 F.2d 386, 388, 394-95 (1976). The memorandum recounting the negotiations described it simply: "The contractor proposed a profit of $1,449,000, equal to 10% of proposed estimated cost. A profit of $1,152,000, equal to 8.8% of total price was negotiated.” It is the more significant that the contractor at first tried to increase the 10 percent to 15 percent and was rebuffed. The point is that a 15 percent profit for part of the work was suggested, opposed and withdrawn. The entire negotiation process by which the asking price of $16 million was agreed to be reduced to $13 million was thus an all but explicit agreement by plaintiff not to a limit of 10 percent on profit, but to the reasonableness of a profit of 10 percent. A 10 percent level of profit is thus a benchmark — only one benchmark and of course subject to adjustment for other statutory factors — for determining what is a reasonable profit.
The next question is as to the source of the actual much-larger-than anticipated profit and what bearing that source, if determined, has on reasonableness of the actual profit. The upshot of the 1963 negotiations was that plaintiff and the Air Force were in agreement on estimates of expectation and reasonableness of a profit of $1,152,000 on estimated costs of $11,878,000. Actual costs are now *285 seen to have been $10,484,147 and actual profit is $2,716,347. The difference between estimated and actual costs is $1,393,853, a sum directly comparable of course with the difference of $1,564,347 between actual profits of $2,716,347 and estimated profits of $1,152,000.
The greatest failure in the cost estimates seems to have been the estimate for labor, as appears from the following comparison of estimates with actual book costs at completion:
[[Image here]]
Risks had more or less disappeared by the time S.A. No. 8 was agreed upon. Completion dates were much closer; much of the work had already been done. All cable had by then been delivered. Cable installation was 90 percent complete and splicing was 10 percent done. In many cases, the Government’s price analysts reported, the work was 80 to 99 percent complete on the construction side of the project. While 1,000 of the 2800 splice cases remained to be delivered, the early production difficulties had been solved and there was little likelihood of late deliveries. In April and May 1963, forecasts of remaining costs and problems were thus comparatively easy. Witness that delivery of the first flight came on May 16,1962 only 2 weeks following agreement on S.A. No. 8 on May 2, 1963, and that deliveries of the remaining flights could be and were accomplished well ahead of the schedule newly agreed in S.A. No. 8. As the Renegotiation Board said, in its *286 Summary of Facts and Reasons in plaintiffs case: "By this time, the contractor must have clearly understood the problems it would encounter in completing the splicing and testing part of the work.”[3]
Ordinarily realized costs lower than estimated costs are regarded as presumptively the result of the efficiency of the contractor. But in May of 1963 this job was far too advanced, and already-incurred costs formed too large a part of the price, for the difference of $1,150,502 between the estimated costs of labor, $4,276,000, and final actual costs, $3,125,498, to be ascribed to plaintiffs efficiency. At that time, the job was 90 percent done as to cable laying and 10 percent done as to splicing. Deliveries of the balance of GFM could be forecasted (and agreed upon) so reliably that the plaintiff could and did deliver the first flight on May 16, 1963, 2 weeks after S.A. No. 8 of May 2, 1963 and the remaining flights in rapid order, on or ahead of schedule. There would be three flights delivered in June, all of them ahead of schedule by 4 to 11 days, three in July, one on time and two 6 and 12 days ahead of schedule, seven more in August, all but one ahead of schedule and that one on time, and the last on September 6, 1973, 25 days ahead of schedule.
With completion so near and its problems foreseeable from the experience to then date, efficiency, of which plaintiff doubtless possessed a goodly amount, does not explain the "savings” in costs. Unrealistic or inflated cost estimates are the alternative.
The source of the twice-more-than-estimated profits is held to be the plaintiffs inflated cost estimates, presented in a non-competitive setting in which the Government was *287 unable, or made unable by plaintiff, to discern the degree of the overestimates. A "sideways” glance at the Renegotiation Board’s Summary of Facts and Reasons (note 3, supra) reveals that it came to the same conclusion: that "in the opinion of the Board, the high rate of profit realized is attributable more to overpricing than to efficiency.”
It seems only too likely that fortified by the obstacles put in the way of the Air Force’s pricing analysts, plaintiff projected the runout costs by the standard of the high costs experienced in the early days of the confusion wrought by the late deliveries of GFM, without adjustment downwards for the relative ease of the remaining work. However costs were overestimated, the Air Force investigators intentionally or not were denied the data for a full analysis of the estimates. Finally, bargaining in units of millions of dollars obscured the fact and degree of the cost overestimates.
An overestimation of costs in a fixed-price contract does not militate against the right of the contractor to all the profits resulting from the overestimates.[4] It is a different matter entirely in renegotiation, in the special context here, of the noncompetitive context of the 1963 repricing, the difficulties caused the Air Force analysts and the repeated indications that the parties agreed on the reasonableness of a profit less than half of what was realized.
It is therefore concluded that the profit made by virtue of these considerations was unreasonably high, under the factor of reasonableness of costs and profits.
The Reasonable Profit, on All the Factors
Plaintiff has made the prima facie case required of it under Lykes Bros SS.Co. v. United States, 206 Ct. Cl. 354, 513 F.2d 1342 (1975); Aero Spacelines Inc. v. United States, 208 Ct.Cl. 704, 530 F.2d 324 (1976). It has proved its costs and profits; that the project it carried out was important, novel and complex, that it performed with considerable *288 efficiency, took some risks, made a valuable contribution to national defense. The burden of proof of excessiveness of plaintiffs profits is thereupon shifted to the Government.
The Government, on the other hand, has also met the burden so imposed on it of showing very considerable excessiveness, primarily by the anticipated rate of profit and the overpricing in a noncompetitive context, in the repricing of the contract in May of 1963. The remaining evidence — largely the rates of profit made by the individual partners and the average profits made in heavy construction — contributes a little to confirm the result.[5]
The precise degree of excessiveness is as usual much more difficult to determine, since it involves adjustments for plaintiffs undoubted efficiency and contribution to the national defense and such risks as plaintiff took. The difficulties of calculation, however, may not deny to the Government recoupment of excessive profits earned from war and wartime diminution of competition. Adjustments of such size must, and on the record can be, allowed to plaintiff as to compensate it for its efficiency and other merits, avoid any injustice by the lightening of the burden of proof on the defendant and yet recoup the excessive portion of the profits. Cf. Butkin Precision Mfg. Corp. v. United States, supra, passim. Major Coat Co. v. United States, 211 Ct. Cl. 1, 48, 543 F.2d 97, 124 (1976); A.C. Ball Co. v. United States, 209 Ct. Cl. 223, 264-65, 531 F.2d 993, 1016-17 (1976). Thus can be reconciled the impressive showing made by the Government in meeting its burden of *289 showing excessiveness and the comparatively more modest showing of the plaintiff in meeting its burden of showing efficiency and its other commendable qualities.
The starting point will be the approximately 10 percent rate of profit so repeatedly referred to in the negotiations. As a first adjustment, the anticipated profit will be increased to $1,152,000, the precise sum contemplated in the 1963 negotiations, although 10 percent of actual costs of $10,484,147 would be a lesser sum. To this sum will be added 5 percent of actual costs, or $524,207, for the very considerable efficiency displayed by plaintiff. Plaintiffs efficiency was reflected in its own work, in its unusual management skills and in the savings it worked in the Government’s costs of GFM by its husbandly and thrifty care of the materials. It would be helpful to be able to quantify these latter savings, but plaintiff has not done so and it is too much to expect that the Government should prove the results of plaintiffs economical treatment of GFM in plaintiffs care. An allowance for efficiency must nevertheless be made, with the conviction that it will not be parsimonious. The justice and adequacy of the allowance of 5 percent of total actual costs may be grounded in the fact that a 5 percent bonus for earned efficiency was briefly sought by plaintiff, in the negotiations in April 1963. A further additional 2% percent of costs will be allowed for the plaintiffs contribution to national defense and the other statutory factors. Both these allowances are more intuitive than demonstrable.
The total is 7% percent of actual costs plus the profit contemplated. Plaintiff will thus have its anticipated profit, an additional reward for efficiency in principle equal to what it wanted and still another 2% percent on account of other statutory factors for which it is entitled to favorable consideration. The total of such adjustments, added to the basic sum of $1,152,000 will surely compensate the plaintiff for its efficiency and the other statutory factors. If this is what has been called rough calculation, it is surely a calculation generous to the plaintiff and yet responsive to the mandate of the Renegotiation Act against profiteering.
*290 To the anticipated profit of $1,152,000 there is thus to be added $786,311, 7% percent of the actual costs of $10,484,147, to make a total of $1,938,311. This sum is held on consideration of all the statutory factors to be the reasonable, non-excessive profit. The remainder of plaintiffs profit of $2,716,347, or $778,036, is unreasonable and excessive within the meaning of the Renegotiation Act. Plaintiffs allowed profit of $1,938,311 is 18.5 percent of plaintiffs costs of $10,484,147 and 15.6 percent of gross renegotiable receipts of $12,422,458 as reduced from $13,200,494 by the $778,036 held excessive.

Final contract price in Wing 3 according to a second source in the record was $6.6 million.

 These controversies have no general interest and are discussed in detail in the findings. Five claimed items of G&A costs were challenged by the Government. The challenges are sustained as to $52,583 in interest which was paid to partners, and as to a sum of $208,885, which is the unsubstantiated portion of a claimed home office service charge otherwise allowed in the amount of $103,052. The challenges are held to fail in respect of a loss of $38,369 on sales of equipment, $1313 for donations and $19,252 in miscellaneous G&A expended after completion of the contract. The total thus successfully challenged is $261,468, which on subtraction from claimed G&A costs leaves $2,334,980 as the final G&A costs.
Next, direct costs of sales of $8,166,902 are on a challenge by the Government reduced by $17,735, on account of the forgiveness by the joint venture of one of the partners of a sum owed in this amount; final direct costs are thus $8,149,167.
Direct cost of sales of $8,149,167 plus the G&A costs of $2,334,980 produce a total cost of sales of $10,484,147.
Gross renegotiable income is held to be $13,200,494, the product of book contract proceeds of $13,148,613 and an item of $51,881 of "other income” not shown to be unrelated to the Air Force contract. A sum of $66,433, claimed by the Government to be part of contract income, is held to be bank interest received by the venture and therefore not part of renegotiable income.
Gross receipts of $13,200,494 less costs of sales of $10,484,147 leaves a net profit of $2,716,347, as stated in the text.

 Section 1460.10 of the Renegotiation Board’s Regulations provides in part as follows (32 C.F.R. § 1460.10(b)(1) (1973)):
Comparisons will be made with the contractor’s own costs and profits of other contractors, if such information is available.

 The use of the Board’s opinion, to the extent such use is made in this opinion, is in no way inconsistent with the adamant proposition that in this court the proceeding is de novo; that the Board’s decision gets no presumption of correctness and that its opinion is not evidence. Withal, the Board has at least some expertise and experience. Its after-renegotiation profit allowances are legitimate data for use in determination of reasonable levels of profit (Major Coat Co. v. United States, 211 Ct. Cl. 1, 543 F.2d 97 (1976)) and a "sideways glance” may be directed at its opinions. Gibraltar Mfg. Co. v. United States, supra; compare Mason & Hanger-Silas Mason Co. v. United States, supra, 207 Ct. Cl. at 149, 518 F.2d at 1366-67 (dissenting opinion by Nichols, J.); Major Coat Co. v. United States, 211 Ct. Cl. 49, 549 F.2d 196 (1977), order denying rehearing, (Nichols, J., concurring); 32 C.F.R. §1459.1(b)(5) (1975). No more than such a glance is intended, here, throughout.

 The Truth in Negotiations legislation had been enacted not long before these negotiations. Public Law 87-653, 76 Stat. 528 (1962) as now amended, 10 U.S.C. § 2306(f) (1970)).

 For what it is worth (see note 3, supra) the Renegotiation Board came to the same conclusion, on substantially the same facts. In its "Summary of Facts and Reasons” under the heading "Profits,” the Board wrote as follows:
“Considering the character of the operations involved in these proceedings, the delayed negotiation of the final contract price, and the profits realized by other contractors on similar projects, the $2,430,863 profits, or 18.5% of sales, after the Board’s specific cost allowances discussed above, appear unduly high and excessive. It is clear from the contract record that neither the contractor nor the Air Force contemplated a profit margin of this proportion at any stage of the operations. Although not controlling, it is interesting to note from the profit history of the four venturers that none of the companies approached the profit margin realized by the joint venture. Even after ample allowances are made for the differences between the work performed by the contractor and that previously performed by the individual companies, it would appear that historical earnings do not support a claim of reasonableness in the profits realized by the contractor in the review year.”